**C. A. HARDY, et al.,**
**Plaintiffs-Appellees,**

v.

**JOHNS–MANVILLE SALES CORPORA-**
**TION, et al., Defendants-Appellants.**

No. 81–2204.

United States Court of Appeals,
Fifth Circuit.

July 26, 1982.

Rex Houston, Henderson, Tex., F. Scott Baldwin, Marshall, Tex., for plaintiffs-appellees.

Royal H. Brin, Jr., Dallas, Tex., for GAF Corp. and Ruberoid Co.

Stephen R. Patterson, Longview, Tex., for Eagle-Picher Industries, Inc.

Otto A. Ritter, Longview, Tex., for URARCO Ind., Inc.

J. Carlisle DeHay, Jr., Dallas, Tex., for Armstrong Cork Co.

Mike Hatchell, Tyler, Tex., for Nicolet.

Jeffrey S. Lynch, Dallas, Tex., for Raybestos-Manhattan, Inc.

T. John Ward, Longview, Tex., for Forty-Eight Insulations, Inc.

James W. Wray, Jr., Corpus Christi, Tex., for Garlock, Inc.

Clyde Bracken, Dallas, Tex., for Grefco, Inc.

James T. Foley, Tyler, Tex., for Crown Cork & Seal Co., Inc. and Mundet Cork Corp.

Howard Waldrop, Texarkana, Tex., for Keene Corp.

Richard L. Josephson, Larry D. Carlson, Houston, Tex., for Ownes-Illinois.

George A. Weller, William J. McCarthy, Beaumont, Tex., for Firbreboard.

Don W. Kent, Tyler, Tex., for Celotex.

Frank Finn, Jr., Dallas, Tex., for Johns-Manville Sales Corp.

Before GEE and JOHNSON, Circuit Judges, and VAN PELT\*, District Judge.

GEE, Circuit Judge:

This appeal arises out of a diversity action brought by various plaintiffs—insulators, pipefitters, carpenters, and other factory workers—against various manufactur-

\* District Judge of the District of Nebraska, sit-    ting by designation.

ers, sellers, and distributors of asbestos-containing products. The plaintiffs, alleging exposure to the products and consequent disease, assert various causes of action, including negligence, breach of implied warranty, and strict liability. The pleadings in each of the cases are substantially the same. No plaintiff names a particular defendant on a case-by-case basis but, instead, includes several—often as many as twenty asbestos manufacturers—in his individual complaint. The rationale offered for this unusual pleading practice is that, given the long latent period of the diseases in question, it is impossible for plaintiffs to isolate the precise exposure period or to identify the particular manufacturer's product responsible. The trial court accepted this rationale and opted for a theory of enterprise- or industry-wide liability used in, for example, *Sindell v. Abott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (1980), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980) (on proof that plaintiffs contracted a DES-related cancer and that their mothers took DES during pregnancy, market share apportionment determines a manufacturer's liability unless a given manufacturer exculpates itself by proving that its product could not have caused the injury). The trial court held that Texas courts, faced with the impossibility of identifying a precise causative agent in these asbestos cases, would adopt a form of *Sindell* liability, described as a "hybrid, drawing from concepts of alternative and/or concurrent liability and the law of products liability to form a type of absolute liability." The trial court ruled that "discovery on percentage

share of a relevant market may lead to admissible evidence in the trials of some, and perhaps all, of these cases" and therefore granted leave to consolidate them for discovery purposes. This ruling is not on appeal here.

Defendants' interlocutory appeal under 28 U.S.C. § 1292(b) is directed instead at the district court's amended omnibus order dated March 13, 1981, which applies collateral estoppel to this mass tort. 509 F.Supp. 1353. The omnibus order is, in effect, a partial summary judgment for plaintiffs based on nonmutual offensive collateral estoppel and judicial notice derived from this court's opinion in *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974) (henceforth *Borel*). *Borel* was a diversity lawsuit in which manufacturers of insulation products containing asbestos were held strictly liable to an insulation worker who developed asbestosis and mesothelioma and ultimately died. The trial court construed *Borel* as establishing as a matter of law and/or of fact that: (1) insulation products containing asbestos as a generic ingredient are "unavoidably unsafe products," (2) asbestos is a competent producing cause of mesothelioma and asbestosis, (3) no warnings were issued by any asbestos insulation manufacturers prior to 1964, and (4) the "warning standard" was not met by the *Borel* defendants in the period from 1964 through 1969.[1] Insofar as the trial court based its omnibus order on the res judicata effect of *Borel*, this aspect of the order is no longer valid. *Migues v. Fibreboard Corp.*, 662 F.2d 1183

---

1. The omnibus order states in relevant part:

1. Relying upon the Court's opinions in *Flatt v. Johns-Manville Sales Corporation*, 488 F.Supp. 836 (E.D.Tex.1980) and a contemporaneously entered memorandum in the *Hardy* case, collateral estoppel in some form shall be entered in each of the foregoing cases. Issue preclusion may extend to the ultimate issue of marketing an unreasonably dangerous product or be limited to cluster issues depending upon the particular facts of the case.

2. In any event, no evidence shall be introduced on the issue of whether asbestos causes either asbestosis or mesothelioma.

3. Further, no evidence shall be introduced on the issue of knowledge as it may relate to a duty to warn due to the res judicata and/or collateral estoppel effect of *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). In essence, no evidence shall be admitted with respect to a state of the art defense. Our summary of the court's conclusions is drawn both from the order and from the court's opinion at 509 F.Supp. 1353 (E.D.Tex.1981).

(5th Cir. 1981). The sole issue on appeal is the validity of the order on grounds of collateral estoppel or judicial notice.

In *Flatt v. Johns-Manville Sales Corp.*, 488 F.Supp. 836 (E.D.Tex.1980), the same court outlined the elements of proof for plaintiffs in asbestos-related cases. There the court stated that the plaintiff must prove by a preponderance of the evidence that

1. Defendants manufactured, marketed, sold, distributed, or placed in the stream of commerce products containing asbestos.

2. Products containing asbestos are unreasonably dangerous.

3. Asbestos dust is a competent producing cause of mesothelioma.

4. Decedent was exposed to defendant's products.

5. The exposure was sufficient to be a producing cause of mesothelioma.

6. Decedent contracted mesothelioma.

7. Plaintiffs suffered damages.

*Id.* at 838, *citing Restatement (Second) of Torts* § 402A(1) (1965). The parties agree that the effect of the trial court's collateral estoppel order in this case is to foreclose elements 2 and 3 above. Under the terms of the omnibus order, both parties are precluded from presenting evidence on the "state of the art"—evidence that, under Texas law of strict liability, is considered by a jury along with other evidence in order to determine whether as of a given time warning should have been given of the dangers associated with a product placed in the stream of commerce. Under the terms of the order, the plaintiffs need not prove that the defendants either knew or should have known of the dangerous propensities of their products and therefore should have warned consumers of these dangers, defendants being precluded from showing otherwise. On appeal, the defendants contend that the order violates their rights to due process and to trial by jury. Because we conclude that the trial court abused its discretion in applying collateral estoppel and judicial notice, we reverse.

## CHOICE OF LAW

An initial question presented on appeal is what law governs the application of collateral estoppel in a diversity suit involving a prior federal judgment. Appellants argue that the trial court's choice of federal law was incorrect. According to appellants, these cases, couched in terms of Texas law of strict liability and negligence, should be governed by Texas rules of collateral estoppel. The choice of law question is supposedly of significance because, according to appellants, Texas strictly adheres to the doctrine of mutuality, *i.e.*, neither party can use a prior judgment to estop another unless both parties were bound by the prior judgment. If this view of Texas law is correct, the plaintiffs here, none of whom were parties to *Borel*, would of course be unable to invoke collateral estoppel.

We need not resolve the question of whether appellants' view of Texas law of collateral estoppel is correct, however, since the district court was bound under the law of our circuit to apply federal law. In *Johnson v. United States*, 576 F.2d 606, 613 (5th Cir. 1978), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981), we stated that federal res judicata principles apply in federal tort claim actions in order to preserve the integrity of federal court judgments and that this rationale applies equally to diversity cases. *Accord, Southern Pacific Transportation Co. v. Smith Materials Corp.*, 616 F.2d 111, 115 (5th Cir. 1980); *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 716–17 (5th Cir.), *cert. denied*, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975). While appellants try valiantly to distinguish these cases, essentially on the grounds that these involved instances in which "the very issue involved in the first case was the subject of attempted litigation in the second," the distinction is one without significance. As the authors of the *Restatement (Second)—Judgments* conclude, the principle of finality essential to a court's authority demands that "federal law determine the effects under the rules of res judicata of a judgment of a federal court."

*Restatement (Second)—Judgments* § 87 (1982).[2]

Having determined that federal law of collateral estoppel governs, we next turn to an examination of just what that law is. In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Supreme Court was asked to determine "whether a party who has had issues of fact adjudicated adversely to it in an equitable action may be collaterally estopped from relitigating the same issues before a jury in a subsequent legal action brought against it by a new party." *Id.* at 324, 99 S.Ct. at 648. The Court responded affirmatively, noting offensive collateral estoppel's "dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Id.* at 326, 99 S.Ct. at 649. The Court reiterated that mutuality is not necessary to proper invocation of collateral estoppel under federal law, citing *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), and further held that the use of offensive collateral estoppel does not violate a defendant's seventh amendment right to a jury trial. To avoid problems with the use of the doctrine, the Court adopted a general rule of fairness, stating "that in cases where plaintiff could easily have joined in the earlier action or where ... for other reasons, the application of offensive collateral estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." 439 U.S. at 331, 99 S.Ct. at 651. *See also Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1170–71 (5th Cir. 1981).

■ In the wake of *Parklane*, it is clear that a right, question, or fact[3] distinctly put in issue and directly determined as a ground of recovery by a court of competent jurisdiction collaterally estops a party or his privy from relitigating the issue in a subsequent action. So stated, the doctrine recognizes that a person "cannot be bound by a judgment unless he has had reasonable notice of the claim against him and opportunity to be heard in opposition to that claim. 1B J. Moore, *Moore's Federal Practice* ¶ 0.411 at 1252 (2d ed.1982) (henceforth *Moore's*). The right to a full and fair opportunity to litigate an issue is, of course, protected by the due process clause of the United States Constitution. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. at 329, 91 S.Ct. at 1444; *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). While *Parklane* made the doctrine of mutuality effectively a dead letter under federal law, the case left undisturbed the requisite of privity, *i.e.*, that collateral estoppel can only be applied against parties who have had a prior " 'full and fair' opportunity to litigate their claims." 439 U.S. at 332, 99 S.Ct. at 652. The requirement that a person against whom the conclusive effect of a judgment is invoked must be a party or a privy to the prior judgment retains its full vigor after *Parklane* and has been repeatedly affirmed by our court. *See, e.g., Marcus v. St. Paul Fire & Marine Insurance Co.*, 651 F.2d 379, 382 n.3 (5th Cir. 1981); *In re Merrill*, 594 F.2d 1064, 1067 n.3 (5th Cir. 1979); *Johnson v. United States*, 576 F.2d at 615. *See also Restatement (Second) of Judgments* § 34 (1982).

## THE NON-*BOREL* DEFENDANTS

■ This is the first and, in our view, insurmountable problem with the trial court's application of collateral estoppel in the case *sub judice*. The omnibus order under review here does not distinguish between defendants who were parties to *Borel* and those who were not; it purports to estop all defendants because all purportedly

---

2. We acknowledge that not all circuits have followed what the authors of the Restatement regard as "the better reasoned" rule. *Restatement (2d)—Judgments* § 87, comment b. This circuit's adherence to the rule is, however, settled.

3. It is well established that collateral estoppel embraces matters both of fact and of law. *See* 1B J. Moore, *Moore's Federal Practice* ¶ 0.442, at 3851 (2d ed. 1982).

share an "identity of interests" sufficient to constitute privity.[4] The trial court's action stretches "privity" beyond meaningful limits. While we acknowledge the manipulability of the notion of "privity," see, e.g., *Collateral Estoppel of Nonparties*, 87 Harv. L.Rev. 1485, 1490, 1494–95 & n.66 (1974), this has not prevented courts from establishing guidelines on the permissibility of binding nonparties through res judicata or collateral estoppel. Without such guidelines, the due process guarantee of a full and fair opportunity to litigate disappears. Thus, we noted in *Southwest Airlines Co. v. Texas International Airlines*, 546 F.2d 84, 95 (5th Cir. 1977):

> Federal courts have deemed several types of relationships "sufficiently close" to justify preclusion. First, a nonparty who has succeeded to a party's interest in property is bound by any prior judgments against that party.... Second, a nonparty who controlled the original suit will be bound by the resulting judgment.... Third, federal courts will bind a nonparty whose interests were represented adequately by a party in the original suit.

(citations omitted). The rationale for these exceptions—all derived from *Restatement (Second) of Judgments* §§ 30, 31, 34, 39–41 (1982)—is obviously that in these instances the nonparty has in effect had his day in court. In this case, the exceptions elaborated in *Southwest Airlines* and in the *Restatement* are inapplicable. First, the *Borel* litigation did not involve any property interests. Second, none of the non-*Borel* defendants have succeeded to any property interest held by the *Borel* defendants. Finally, the plaintiffs did not show that any non-*Borel* defendant had any control whatever over the *Borel* litigation. "To have

control of litigation requires that a person have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action. He must also have control over the opportunity to obtain review." *Restatement (Second) of Judgments* § 39, comment c (1982). *Accord, e.g., Moore's* ¶ 0.411[6] at 1564–67. In, for example, *Sea-Land Services v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), the Supreme Court held that a nonparty may be collaterally estopped from relitigating issues necessarily decided in a suit by a party who acted as a fiduciary responsible for the beneficial interests of the nonparties. Even in this context, however, the Court placed the exception within strict confines: "In such cases, 'the beneficiaries are bound by the judgment with respect to the interest which was the subject of the fiduciary relationship ....' " *Id.* at 593–94, 94 S.Ct. at 819, *quoting* F. James, *Civil Procedure* § 11.28 at 592 (1965). Many of our circuit's cases evince a similar concern with keeping the nonparties' exceptions to res judicata and collateral estoppel within strict confines. *See, e.g., Southwest Airlines Co. v. Texas International Airlines, supra.*

The fact that all the non-*Borel* defendants, like the *Borel* defendants, are engaged in the manufacture of asbestos-containing products does not evince privity among the parties. The plaintiffs did not demonstrate that any of the non-*Borel* defendants participated in any capacity in the *Borel* litigation—whether directly or even through a trade representative—or were even part of a trustee-beneficiary relationship with any *Borel* defendant.[5] On the contrary, several of the defendants indicate on appeal that they were not even aware of the *Borel*

---

**4.** The following defendants were not parties to *Borel*: Owens Corning Fiberglass, 48 Insulation, Garlock, Crown Cork & Seal, Moodette, GREFCO, Keene, Owens Illinois, Raybestos-Manhattan, Standard Asbestos Mfg. & Insulating, UNARCO Industries, Nicolette, and Celotex. Six of the present appellants were parties to *Borel*: Pittsburgh Corning, Armstrong Cork, Phillip Carey, Ruberoid, Johns-Manville, and Fibreboard Paper. Owens Corning Fiberglass, Standard Asbestos Mfg. & Insulating, UNAR-

CO, and Eagle-Picher Industries settled before trial. The trial court in *Borel* instructed a verdict in favor of Combustion Engineering because the plaintiff had failed to show that he had ever been exposed to any products of that company.

**5.** Indeed, the plaintiffs were compelled to prove little, since the trial court entered its omnibus order on its own motion without any evidentiary hearing.

litigation until those proceedings were over and that they were not even members of industry or trade associations composed of asbestos product manufacturers.[6]

Plaintiffs can draw little support from the doctrine of "virtual representation" of cases such as *Aerojet-General Corp. v. Askew, supra*, in which we stated that "[u]nder the federal law of res judicata, a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative" and that "the question whether a party's interests in a case are virtually representative of the interests of a nonparty is one of fact for the trial court." 511 F.2d at 719. In that case we approved a district court's determination that the interests of two government entities were so closely aligned that a prior judgment against one entity bound the other. The proposition that governments may represent private interests in litigation, thereby precluding relitigation, while uncertain at the margin, appears to be an unexceptional special instance of the examples noted in Restatement (Second) of Judgments § 41(1) (1982).[7] The facts here permit no inference of virtual representation of interest. As we explained in *Pollard v. Cockrell*, 578 F.2d 1002, 1008–9 (5th Cir. 1978):

> Virtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to nonparties who file a subsequent suit raising identical issues.... In the instant case ... the [first] plaintiffs were in no sense legally accountable to the [second] plaintiffs; they shared only an abstract interest in enjoining enforcement of the ordinance. The [first] plaintiffs sued in their individual capacities and not as representatives of a judicially certified class. Representation by the same attorneys cannot furnish the requisite alignment of interest
> . . . .

Thus, in *Pollard* we rejected the contention that one group of massage parlor owners were bound by a judgment in a prior lawsuit brought by another group. Virtual representation was rejected despite nearly identical pleadings filed by the groups and representation by common attorneys. The court's omnibus order here amounts to collateral estoppel based on similar legal positions—a proposition that has been properly rejected by at least one other district court that considered the identical issue. *Mooney v. Fibreboard Corp.*, 485 F.Supp. 242, 249 (E.D.Tex.1980). We agree with the Texas Supreme Court that "privity is not established by the mere fact that persons may happen to be interested in the same question or in proving the same state of facts," *Benson v. Wanda Petroleum Co.*, 468 S.W.2d 361, 363 (Tex.1971), and hold that the trial court's actions here transgress the bounds of due process.

Our conclusion likewise pertains to those defendants who, while originally parties to the *Borel* litigation, settled before trial. *See supra* note 4. The plaintiffs here did not show that any of these defendants settled out of the *Borel* litigation after the

---

**6.** Since *Borel* was neither designated nor approved as a class action, there can be no claim that any non-*Borel* defendant is bound as representative of a class.

**7.** § 41. Person Represented by a Party

(1) A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is:

(a) The trustee of an estate or interest of which the person is a beneficiary; or

.(b) Invested by the person with authority to represent him in an action; or

(c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or

(d) An official or agency invested by law with authority to represent the person's interests; or

(e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.

(2) A person represented by a party to an action is bound by the judgment even though the person himself does not have notice of the action, is not served with process, or is not subject to service of process.

entire trial had run its course and only the judicial act of signing a final known adverse judgment remained. Such action would suggest settlement precisely to avoid offensive collateral estoppel and, in an appropriate case, might preclude relitigation. All the indications here are, however, that the defendants in question settled out of the case early because of, for example, lack of product identification. Like the non-*Borel* defendants, these defendants have likewise been deprived of their day in court by the trial court's omnibus order.

### THE *BOREL* DEFENDANTS

■ The propriety of estopping the six defendants in this case who were parties to *Borel* poses more difficult questions. In ascertaining the precise preclusive effect of a prior judgment on a particular issue, we have often referred to the requirements set out, *inter alia*, in *International Association of Machinists & Aerospace Workers v. Nix*, 512 F.2d 125, 132 (5th Cir. 1975), and cases cited therein. The party asserting the estoppel must show that: (1) the issue to be concluded is identical to that involved in the prior action; (2) in the prior action the issue was "actually litigated"; and (3) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

If it appears that a judgment may have been based on more than one of several distinctive matters in litigation and there is no indication which issue it was based on or which issue was fully litigated, such judgment will not preclude, under the doctrine of collateral estoppel, relitigation of any of the issues.

*Federal Procedure, Lawyers Ed.* § 51.218 at 151 (1981) (citations omitted). *See also, e.g., Moore's* ¶ 0.442; *Restatement (Second) —Judgments* § 29, comment a (1982).

Appellants argue that *Borel* did not necessarily decide that asbestos-containing insulation products were unreasonably dangerous because of failure to warn. According to appellants, the general *Borel* verdict, based on general instructions and special interrogatories, permitted the jury to ground strict liability on the bases of failures to test, of unsafeness for intended use, of failures to inspect, or of unsafeness of the product. Strict liability on the basis of failure to warn, although argued to the jury by trial counsel for the plaintiff in *Borel*, was, in the view of the appellants, never formally presented in the jury instructions and therefore was not essential to the *Borel* jury verdict.

Appellants' view has some plausibility. The special interrogatories answered by the *Borel* jury were general and not specifically directed to failure to warn.[8] Indeed, as we discussed at length in our review of the *Borel* judgment, the jury was instructed in terms of "breach of warranty." 493 F.2d at 1091. Although the jury was accurately instructed as to "strict liability in tort" as defined in section 402A of the *Restatement*

---

8.   SPECIAL INTERROGATORY NO. 1: Do you find from a preponderance of the evidence that any of the Defendants listed below was negligent in any of the respects contended by Plaintiff, which negligence was a proximate cause of the injuries and death of the deceased? Answer "Yes" or "No" opposite the named defendant. [The jury answered "No" as to Pittsburgh and Armstrong and "Yes" as to the other four defendants.]

   SPECIAL INTERROGATORY NO. 2: [This interrogatory submitted the question whether any of the six defendants were guilty of an act or acts of gross negligence, and the jury found that no defendant was guilty of gross negligence.]

   SPECIAL INTERROGATORY NO. 3: Do you find from a preponderance of the evidence that the deceased was guilty of contributory negligence and that such negligence was a proximate cause of the injuries and death of the deceased? [The jury answered "Yes."]

   SPECIAL INTERROGATORY NO. 4: Do you find from a preponderance of the evidence that the warranties as contended for by the Plaintiff were violated by any of the Defendants listed below, which breach of warranty was a proximate cause of the injuries and death of the deceased? [The jury answered "Yes" as to each defendant.]

   SPECIAL INTERROGATORY NO. 5: What amount of money, if paid now in cash, would fairly and reasonably compensate the Plaintiff, Freida Borel, for the damages she sustained by virtue of the death of her husband? ANSWER: Actual damages $68,000. Damages for gross negligence "None."

*(Second) of Torts*, that phrase was never specifically mentioned in the jury's interrogatories. It is also true that the general instructions to the *Borel* jury on the plaintiff's causes of action did not charge on failure to warn, except in connection with negligence.[9] Yet appellants' argument in its broadest form must ultimately fail. We concluded in *Borel*:

> The jury found that the unreasonably dangerous condition of the defendants' product was the proximate cause of Borel's injury. This necessarily included a finding that, had adequate warnings been provided, Borel would have chosen to avoid the danger.

493 F.2d at 1093. As the appellants at times concede in their briefs, "if *Borel* stands for any rule at all, it is that defendants have a duty to warn the users of their products of the long-term dangers attendant upon its use, including the danger of an occupational disease." Indeed, the first sentence in our *Borel* opinion states that that case involved "the scope of an asbestos manufacturer's duty to warn industrial in-

---

**9.** The jury was instructed, *inter alia*, as follows: Mrs. Borel, as the plaintiff, alleges that the defendants, each and all of them, were guilty of negligence, which negligence was the proximate cause. Now, the plaintiff contends that the defendants knew or in the exercise of ordinary or reasonable care ought to have known that the insulation they so prepared and manufactured and distributed were deleterious, poisonous and highly harmful to the deceased's body, lungs, respiratory system, skin and health, and that therefore the defendants were negligent in failing to take any reasonable precaution or exercise reasonable care to warn the deceased of the danger and the harm to which he was exposed while handling the defendants' asbestos product as an insulator.

Further, they allege that the defendants were negligent in failing and omitting to provide the deceased with the knowledge as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances or method of handling or using said products so as to protect the deceased from being disabled and resulting in his death.

Further, they contend that the defendants should have tested their products, especially those containing asbestos, to ascertain the safe or dangerous nature of such products before offering them for sale, that the defendants should have removed such product from the market upon ascertaining that such products would cause asbestosis. Now those are the specific acts of negligence contended for by the plaintiff.

Now, in this connection it is necessary for the Court to give you certain instructions in regard to the warning. As you know, one of the acts of negligence contended for by the plaintiff and perhaps the principle act of negligence is that the manufacturer should have given a warning or a proper warning to the use of its product. The Court would instruct you that a manufacturer of goods has a duty to give reasonable warning as to the dangers inherent or reasonably foreseeable in using his product. The defendants are under an obligation and duty to give reasonable warning as to the danger of their products, even if the product or products is not being used in a specific manner, so long as the use to which the product was put was a use that the manufacturer could reasonably foresee.

Also in connection with the manner of warning, the Court would instruct you that the defendants are under no duty to warn of any danger in the use of their products unless and until the state of the medical and technical knowledge was such that a reasonabl[y] prudent manufacturer would have been aware of the danger and the necessity of giving warning.

Further, the defendant cannot be held responsible for failure to give warnings unless it is first established by a preponderance of the evidence that the state of the medical and technical knowledge was such that the defendants, manufacturers of the products, involved knew or in the ordinary exercise of care should have known that the manner in which their products was being handled, used and installed by insulator workers rendered them unreasonably dangerous to the user or consumer or those engaged in the installing of the product.

Now, keeping these specific acts of negligence in mind, the Court would instruct you that if you find from a preponderance of the evidence that the defendants or any one of them was guilty of any one act or omission of negligence contended for by the plaintiff and that such act of negligence was a proximate cause of the injuries and death of Mr. Borel, then you would find for the plaintiff, unless you should find for the defendant or defendants under some further instruction of the Court. The Court would further instruct you that you need not find that all of the acts or omissions of negligence as contended for by the plaintiff exist. You only have to find that some one act or omission of negligence existed from a preponderance of the evidence and which single act or omission of negligence was the proximate cause. . . .

sulation workers of dangers associated with the use of asbestos." *Id.* at 1081. *See also* 493 F.2d at 1105 (on rehearing). Our conclusion in *Borel* was grounded in that trial court's jury instructions concerning proximate cause and defective product, which we again set forth in the margin.[10] Close reading of these instructions convinced our panel in *Borel* that a failure to warn was necessarily implicit in the jury's verdict. While the parties invite us to reconsider our holding in *Borel* that failure to warn grounded the jury's strict liability finding in that case, we cannot, even if we were so inclined, displace a prior decision of this court absent reconsideration en banc. Further, there is authority for the proposition that once an appellate court has disposed of a case on the basis of one of several alternative issues that may have grounded a trial court's judgment, the issue decided on appeal is conclusively established for purposes of issue preclusion. *See Moore's* ¶ 0.416[2] at 2231, ¶ 443[5] at 3921 n.10; *IRO v. Republic SS Corp.*, 189 F.2d 858, 862 (4th Cir. 1951). Nonetheless, we must ultimately conclude that the judgment in *Borel* cannot

estop even the Borel defendants in this case for three interrelated reasons.

First, after review of the issues decided in *Borel*, we conclude that *Borel*, while conclusive as to the general matter of a duty to warn on the part of manufacturers of asbestos-containing insulation products, is ultimately ambiguous as to certain key issues. As the authors of the *Restatement (Second) —Judgments* § 29, comment g (1982), have noted, collateral estoppel is inappropriate where the prior judgment is ambivalent:

> The circumstances attending the determination of an issue in the first action may indicate that it could reasonably have been resolved otherwise if those circumstances were absent. Resolution of the issue in question may have entailed reference to such matters as the intention, knowledge, or comparative responsibility of the parties in relation to each other.... In these and similar situations, taking the prior determination at face value for purposes of the second action would extend the effects of imperfections in the adjudicative process beyond the

**10.** The *Borel* trial court had stated in part:

Now, turning our attention to the matter of the defenses of the defendants in connection with the implied warranty or strict liability, you are charged that if there is any unreasonable risk or danger from using defendants' products containing asbestos, which risk or danger must be *the risk or danger beyond that which would be contemplated by insulation contractor or insulator with the knowledge available to them as to characteristics of the product, such unreasonable risk or danger from using defendants' product must have been reasonably foreseen by the manufacturer.* Therefore, if you find from a preponderance of the evidence that Mr. Borel came in contact with the defendants' product and developed asbestosis thereafter and at such time of contact, the product containing asbestos manufactured by the defendant and that the danger of the use of the said asbestos products by Mr. Borel could not have been reasonably foreseen by the manufacturer, then there could be no proximate cause and your verdict would be for the defendants. In other words, there would be no proximate cause of the breach of the warranty or strict liability that would justify your finding in favor of the plaintiff, but you would have to find for the defendants. Also, in connection with the implied warranty theory, you are instructed that the burden of proof is on the

plaintiff in this case. Before they are entitled to recover any damages against any of the defendants to establish by a preponderance of the evidence that the product sold by the particular defendant or defendants was defective at the time it was sold. Before a product can be found to be defective it must establish that it was unreasonably dangerous to the user o[r] consumer at the time it was sold. *You are further instructed that the burden of proof is on the plaintiff to establish also by a preponderance of the evidence not only that the product was defective but also that the defect in the product was a proximate cause of the death of Clarence Borel.*

*By the term DEFECTIVE as used in this charge is meant a condition not contemplated by the insulator, contractor or ultimate user.* Accordingly, you are instructed that in the event plaintiff has failed to prove by a preponderance of the evidence the existence of a defect in the product at which time the product was sold and that such defect was the proximate cause of the death of Clarence Borel, then you cannot find for the plaintiff on the theory of breach of implied warranty or strict liability and you must return a verdict against the plaintiff and in favor of the defendants.

493 F.2d at 1090 n.26 (emphasis added).

limits of the first adjudication, within which they are accepted only because of the practical necessity of achieving finality.

The *Borel* jury decided that Borel, an industrial insulation worker who was exposed to fibers from his employer's insulation products over a 33-year period (from 1936 to 1969), was entitled to have been given fair warning that asbestos dust may lead to asbestosis, mesothelioma, and other cancers. The jury dismissed the argument that the danger was obvious and regarded as conclusive the fact that Borel testified that he did not know that inhaling asbestos dust could cause serious injuries until his doctor so advised him in 1969. The jury necessarily found "that, had adequate warnings been provided, Borel would have chosen to avoid the danger." 493 F.2d at 1093. In *Borel*, the evidence was that the industry as a whole issued no warnings at all concerning its insulation products prior to 1964, that Johns-Manville placed a warnings label on packages of its products in 1964, and that Fibreboard and Rubberoid placed warnings on their products in 1966. *Id.* at 1104.

Given these facts, it is impossible to determine what the *Borel* jury decided about *when* a duty to warn attached. Did the jury find the defendants liable because their warnings after 1966, when they acknowledged that they knew the dangers of asbestosis, were insufficiently explicit as to the grave risks involved? If so, as appellants here point out, the jury may have accepted the state of the art arguments provided by the defendants in *Borel—i.e.,* that the defendants were not aware of the danger of asbestosis until the 1960's. Even under this view, there is a second ambiguity: was strict liability grounded on the fact that the warnings issued, while otherwise sufficient, never reached the insulator in the field? If so, perhaps the warnings, while insufficient as to insulation workers like Borel, were sufficient to alert workers

further down the production line who may have seen the warnings—such as the carpenters and pipefitters in this case. Alternatively, even if the *Borel* jury decided that failure to warn before 1966 grounded strict liability, did the duty attach in the 1930's when the "hazard of asbestosis as a pneumoconiotic dust was universally accepted," *id.* at 1083, or in 1965, when documentary evidence was presented of the hazard of asbestos insulation products to the installers of these products? [11]

As we noted in *Borel*, strict liability because of failure to warn is based on a determination of the manufacturer's reasonable knowledge:

> [I]n cases such as the instant case, the manufacturer is held to the knowledge and skill of an expert. This is relevant in determining (1) whether the manufacturer knew or should have known the danger, and (2) whether the manufacturer was negligent in failing to communicate this superior knowledge to the user or consumer of its product.... The manufacturer's status as expert means that at a minimum he must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby.

493 F.2d at 1089. Thus, the trial judge in *Borel* instructed the jury that the danger "must have been reasonably foreseen by the manufacturer." *Id.* at 1090. As both this instruction and the ambiguities in the *Borel* verdict demonstrate, a determination that a particular product is so unreasonably hazardous as to require a warning of its dangers is not an absolute. Such a determination is necessarily relative to the scientific knowledge generally known or available to the manufacturer at the time the product in question was sold or otherwise placed in the stream of commerce.[12]

Not all the plaintiffs in this case were exposed to asbestos-containing insula-

---

11. Selikoff, Chirg & Hammond, *The Occurrence of Asbestosis Among Industrial Insulation Workers*, 132 Ann.N.Y.Acad. of Sci. 139 (1965), and discussed at *Borel*, 493 F.2d at 1085.

12. *See, e.g., Crocker v. Winthrop Laboratories*, 514 S.W.2d 429 (Tex.1974).

tion products over the same 30-year period as plaintiff Borel. Not all plaintiffs here are insulation workers isolated from the warnings issued by some of the defendants in 1964 and 1966. Some of the products may be different from those involved in *Borel*. Our opinion in *Borel*, "limited to determining whether there [was] a conflict in substantial evidence sufficient to create a jury question," did not resolve that as a matter of fact all manufacturers of asbestos-containing insulation products had a duty to warn as of 1936, and all failed to warn adequately after 1964. Although we determined that the jury must have found a violation of the manufacturers' duty to warn, we held only that the jury could have grounded strict liability on the absence of a warning prior to 1964 or "could have concluded that the [post-1964 and post-1966] 'cautions' were not warnings in the sense that they adequately communicated to Borel and other insulation workers knowledge of the dangers to which they were exposed so as to give them a choice of working or not working with a dangerous product." 493 F.2d at 1104. As we have already had occasion to point out in *Migues v. Fibreboard Corp.*, 662 F.2d at 1188–89, our opinion in *Borel* merely approved of the various ways the jury could have come to a conclusion concerning strict liability for failure to warn. We did not say that any of the specific alternatives that the jury had before it were necessary or essential to its verdict.

The *only* determination made by this court in *Borel* was that, based upon the evidence in that case, the jury's findings could not be said to be incorrect as a matter of law. But this Court certainly did not decide that every jury presented with the same facts would be compelled to reach the conclusion reached by the *Borel* jury: that asbestos was unreasonably dangerous. Such a holding would have been not only unnecessary, it would also have been unwarranted.

In *Borel*, this Court said: "the jury was *entitled* to find that the danger to Borel and other insulation workers from inhaling asbestos dust was foreseeable to the defendants .at the time the products causing Borel's injuries were sold," 493 F.2d at 1093 (emphasis added).... This Court did not say that, as a matter of law, the danger of asbestos inhalation was so hidden from every asbestos worker in every situation as to create a duty to warn on the part of all asbestos manufacturers. On rehearing, this Court held that although some asbestos products used by plaintiff Borel contained warnings, there was sufficient evidence that the warnings were inadequate to inform workers of the actual dangers posed by asbestos inhalation to justify submission of that issue to the jury. 493 F.2d at 1105. This Court did not state that every jury would be required, as a matter of law, to find such warnings inadequate.

In sum, this Court held in *Borel* only that the *Borel* jury, on the evidence presented to it, could have found that asbestos products unaccompanied by adequate warnings were unreasonably dangerous. The proposition that all juries presented with similar evidence regarding asbestos products would be compelled to find those products unreasonably dangerous was not presented in *Borel*, and therefore, this Court did not reach it. Since *stare decisis* is accorded only those issues necessarily decided by a court in reaching its result, the District Court erred in overreading the holding of our opinion in *Borel*.

*Id.* (emphasis in original). Like *stare decisis*, collateral estoppel applies only to issues of fact or law necessarily decided by a prior court. Since we cannot say that *Borel* necessarily decided, as a matter of fact, that all manufacturers of asbestos-containing insulation products knew or should have known of the dangers of their particular products at all relevant times, we cannot justify the trial court's collaterally estopping the defendants from presenting evidence as to the state of the art.

■ Even if we are wrong as to the ambiguities of the *Borel* judgment, there is a second, equally important, reason to deny collateral estoppel effect to it: the presence

of inconsistent verdicts. In *Parklane Hosiery v. Shore*, 439 U.S. at 330–31, 99 S.Ct. at 651, the Court noted that collateral estoppel is improper and "unfair" to a defendant "if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Id.* at 330, 99 S.Ct. at 651. *Accord Restatement (Second)—Judgments* § 29(4) (1982).[13] Not only does issue preclusion in such cases appear arbitrary to a defendant who has had favorable judgments on the same issue, it also undermines the premise that different juries reach equally valid verdicts. *See Restatement (Second)—Judgments* § 29, comment f (1982). One jury's determination should not, merely because it comes later in time, bind another jury's determination of an issue over which there are equally reasonable resolutions of doubt.

■ The trial court was aware of the problem and referred to *Flatt v. Johns-Manville Sales Corp.*, 488 F.Supp. at 841, a prior opinion by the same court. In *Flatt* the court admitted that Johns-Manville had "successfully defended several asbestos lawsuits in the recent past" but stated that "lawsuits in which Johns-Manville has prevailed have been decided on the basis that there was insufficient exposure to asbestos dust, or alternatively, the plaintiff, or decedent, did not contract asbestosis or mesothelioma." *Id.* Given the information made available to us in this appeal, we must conclude that the trial court in *Flatt* and in the proceeding below was inadequately informed about the nature of former asbestos litigation. On appeal, the parties inform us that there have been approximately 70 similar asbestos cases thus far tried around the country. Approximately half of these seem to have been decided in favor of the defendants.[14] A court able to say that the approximately 35 suits decided in favor of asbestos manufacturers were all decided on the basis of insufficient exposure on the part of the plaintiff or failure to demonstrate an asbestos-related disease would be clairvoyant. Indeed, the appellants inform us of several products liability cases in which the state of the art question was fully litigated, yet the asbestos manufacturers were found not liable. Although it is usually not possible to say with certainty what these juries based their verdicts on, in at least some of the cases the verdict for the defendant was not based on failure to prove exposure or failure to show an asbestos-related disease. In *Starnes v. Johns-Manville Corp.*, No. 2075–122 (E.D.Tenn.1977), one of the cases cited in *Flatt v. Johns-Manville Sales Corp.*, *supra*, the court's charge to the jury stated that it was "undisputed that as a result of inhaling materials containing asbestos, Mr. Starnes contracted the disease known as asbestosis." The verdict for the defendant in *Starnes* must mean, inter alia, that the jury found the insulation products involved in that case not unreasonably dangerous. This court takes judicial notice of these inconsistent or ambiguous verdicts pursuant to Fed.R.Evid. 201(d). We conclude that the court erred in arbitrarily choosing one of these verdicts, that in *Borel*, as the bellwether.

Finally, we conclude that even if the *Borel* verdict had been unambiguous and the sole verdict issued on point, application of collateral estoppel would still be unfair with regard to the *Borel* defendants because it is very doubtful that these defendants could have foreseen that their $68,000 liability to plaintiff Borel would foreshadow multimillion dollar asbestos liability. As noted in *Parklane*, it would be unfair to apply collat-

---

**13.** The injustice of applying collateral estoppel in cases involving mass torts is especially obvious. Thus, in *Parklane* the Court cited Prof. Currie's "familiar example": "A railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26. Professor Currie argues that offensive use of collateral estoppel should not be applied so as to allow plaintiffs 27 through 50 automatically to recover." 439 U.S. at 331 n.14, 99 S.Ct. at 651 n.14, *citing* Currie, *Mutuality of Estoppel: Limits of the Bernhard Doctrine*, 9 Stan.L.Rev. 281, 304 (1957).

**14.** The parties also inform us that there are at least seven judgments in favor of several of the defendants in this case alone.

eral estoppel "if a defendant in the first action is sued for small or nominal damages [since] he may have little incentive to defend vigorously, particularly if future lawsuits are not foreseeable." 439 U.S. at 330, 99 S.Ct. at 651. While in absolute terms a judgment for $68,000 hardly appears nominal, the Supreme Court's citation of *Berner v. British Commonwealth Pacific Airlines,* 346 F.2d 532 (2d Cir. 1965), *cert. denied,* 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966) (application of collateral estoppel denied where defendant did not appeal an adverse judgment awarding damages of $35,000 and defendant was later sued for over $7 million), suggests that the matter is relative. The reason the district court here applied collateral estoppel is precisely because early cases like *Borel* have opened the floodgates to an enormous, unprecedented volume of asbestos litigation. According to a recent estimate, there are over 3,000 asbestos plaintiffs in the Eastern District of Texas alone and between 7,500 and 10,000 asbestos cases pending in United States District Courts around the country. The omnibus order here involves 58 pending cases, and the many plaintiffs involved in this case are *each* seeking $2.5 million in damages. Such a staggering potential liability could not have been foreseen by the *Borel* defendants. *See McCarty v. Johns-Manville Sales Corp.,* 502 F.Supp. 335, 339 (S.D.Miss.1980).

The trial court's application of issue preclusion to the "fact" that asbestos is in all cases a competent producing cause of mesothelioma and asbestosis involves similar problems. *Borel* dealt with the disease-causing aspects of asbestos dust generated by insulation materials. That case did not determine as a matter of fact that because airborne asbestos dust and fibers from thermal insulation materials are hazardous, all products containing asbestos—in whatever quantity or however encapsulated—are hazardous. The injustice in precluding the "fact" that the generic ingredient asbestos invariably and in every use or mode causes cancer is clearest in the case of appellant Garlock. Garlock points out that its products, unlike the loosely woven thermal insulation materials in *Borel* that, when merely handled, emitted large quantities of airborne asbestos dust and fibers, are linoleum-type products in which the asbestos is encapsulated in a rubber-like coating. According to Garlock, its gasket products do not release significant amounts of dust or fibers into the air and have never been demonstrated to be dangerous in installation, use, or removal. Certainly, defendants ought to be free, even after *Borel,* to present evidence of the scientific knowledge *associated with their particular product* without being prejudiced by a conclusive presumption that asbestos in all forms causes cancer. The court regarded collateral estoppel in this context as precluding merely the "can it" question rather than the "did it" question. 509 F.Supp. at 1362. The problem is that the "can it" and "did it" questions cannot in this instance be so easily segregated, and a determination that asbestos generally is hazardous threatens to undermine a defendant's possibly legitimate defense that its product was not scientifically known to be hazardous, now or at relevant times in the past. If the trial court's application of issue preclusion on the generic danger of asbestos is not meant to burden a defendant's ability to present such evidence, then we fail to see the intended usefulness of the court's action.

For much the same reasons, the court's alternative justification for this aspect of its omnibus order—relying upon judicial notice of adjudicative fact under Fed. R.Evid. 201(b)(2) and (c)—is likewise improper. As the court itself concedes, Rule 201 relates to medical facts not subject to reasonable dispute. In *Franklin Life Insurance Co. v. William J. Champion & Co.,* 350 F.2d 115, 130 (6th Cir. 1965), *cert. denied,* 384 U.S. 928, 86 S.Ct. 1445, 16 L.Ed.2d 531 (1966), the court took judicial notice of the fact that cancer does not manifest itself quickly but lies dormant, typically for long periods. As in *Franklin,* judicial notice applies to self-evident truths that no reasonable person could question, truisms that approach platitudes or banalities. The proposition that asbestos causes cancer, because it is inextricably linked to a host of disputed

issues—*e.g.*, can mesothelioma arise without exposure to asbestos, is the sale of asbestos insulation products definitely linked to carcinoma in the general population, was this manufacturer reasonably unaware of the asbestos hazards in 1964—is not at present so self-evident a proposition as to be subject to judicial notice. The rule of judicial notice "contemplates there is to be no evidence before the jury in disproof." Fed.R. Evid. 201, Adv.Comm. Note g (1975). Surely where there is evidence on both sides of an issue the matter is subject to reasonable dispute. Judicial notice was therefore inappropriate here.

Like the court in *Migues*, we too sympathize with the district court's efforts to streamline the enormous asbestos caseload it faces. None of what we say here is meant to cast doubt on any possible alternative ways to avoid reinventing the asbestos liability wheel.[15] We reiterate the *Migues* court's invitation to district courts to attempt innovative methods for trying these cases. We hold today only that courts cannot read *Borel* to stand for the proposition that, as matters of fact, asbestos products are unreasonably dangerous or that asbestos as a generic element is in all products a competent producing cause of cancer. To do otherwise would be to elevate judicial expedience over considerations of justice and fair play.

REVERSED.

*Appendix*

TO: THE STUDY COMMITTEE FOR THE EFFICIENT DISPOSITION OF ASBESTOS–RELATED CASES

FROM: ROBERT M. PARKER, U. S. DISTRICT JUDGE

DATE: JANUARY 22, 1982

SUBJECT: PROPOSED STANDARD PROCEDURES FOR HANDLING ASBESTOS CASES

(COMMITTEE MEMBERS: Plaintiff's Counsel: Walter Umphrey, Marlin Thompson, Scott Baldwin and Rex Houston. Defendants' Counsel: O. J. Weber, Gordon Pate, John Bissell, John Tucker, Jack Flock, John Ward, Carlisle DeHay, and Frank Finn)

Attached please find the proposed standard procedures for handling asbestos cases in the Eastern District in its rough form. I have incorporated, to the extent possible, your suggestions and have included additional procedures at the request of the Clerk's office which are calculated to solve what is amounting to a tremendous paper problem.

I would appreciate your reviewing the proposal and providing me with your observations and recommendations at an early date so that the Order may be implemented as quickly as possible.

In addition to the contents of the proposal there are some other matters on which I would appreciate your comments. The first is an effective way to deal with releases accompanying partial settlements that should be added to paragraph 23. Hopefully, some form of agreed standard order could be entered by the Court that would accomplish the effect of releasing any settling defendant upon payment without the necessity of the creation of additional instruments.

The next matter concerns suggestions for procedures whereby cases of plaintiffs without substantial present symptoms which are productive of disability could be dismissed as having been prematurely filed, preserving a cause of action for the plaintiff in the future in the event actual disability subse-

---

**15.** As an indication of some of the many possible innovative ideas in this area, we attach to this opinion a copy of a memorandum from Judge Robert M. Parker to the Study Committee for the Efficient Disposition of Asbestos-Related Cases dated January 22, 1982. Other possibilities arise from selective adaptation of some of the procedures in the Manual for Complex Litigation. Joint discovery and consolida- tion of appropriate groups of cases for trial of particular common issues are some of the possibilities. We are not here advocating or approving any particular measure but merely enumerating some out of the great range of innovative possibilities that may be explored without doing violence to established requirements and principles of collateral estoppel and judicial notice.

quently develops and eliminating the statute of limitations problem for the particular plaintiff.

I understand Judge Steger is examining the process of preserving the plaintiff's cause of action, and I shall confer with him prior to our next discussion in order to secure his thoughts on the matter.

Also, the utilization of a settlement questionnaire has not been addressed in this proposal, however, I would like to see it implemented and would appreciate your suggestions.

Further, I would appreciate your comments regarding utilization of a standard or uniform pre-trial order to which individualized witness lists and exhibit lists could be filed for each particular case.

## STANDARD PROCEDURE FOR ASBESTOS CASES IN THE EASTERN DISTRICT OF TEXAS

This order shall apply to all cases filed in the Eastern District of Texas that claim damages for injury, illness, or wrongful death as a result of exposure to products containing asbestos. In cases currently pending, the parties shall have sixty (60) days to comply with provisions of this order with which they are not already in compliance.

1. At the time suit is filed on behalf of a plaintiff claiming damages for an asbestos-related injury or disease, the plaintiff's attorney shall file with the Clerk's office, as an exhibit to the plaintiff's complaint, the following:

a. the names and addresses of all consulting, treating, or diagnosing physicians, together with the names and addresses of any physicians the plaintiff may have seen for any reason in the past ten (10) years, and authorization signed by the plaintiff allowing said physicians to release the medical records for examination and copying by the defendants; psychiatrists shall be excepted from this provision, unless the plaintiff is relying on psychiatric testimony to prove damages.

b. copies of any medical or hospital records relied on by the plaintiff to establish the existence of any asbestos-related disease or injury.

c. copies of the plaintiff's income tax records for the past five (5) years or, in lieu thereof, an authorization for income tax records for the past five (5) years executed in favor of each named defendant.

d. authorization in favor of each named defendant to secure social security records.

e. complete answers to the defendants' joint master set of interrogatories on file in the District Clerk's office, which answers shall be supplemented as new information is received up to and including time of trial.

f. the full style, docket number, and date of filing of any suit filed by the plaintiff in any jurisdiction, which contains the same or similar allegations against any of the same defendants.

2. The Clerk's office shall not accept for filing any asbestos suit that does not contain the above-described attachments unless the plaintiff's attorney certifies that the statute of limitations may be about to run, at which time the Clerk's office shall accept the suit and the plaintiff's attorney shall be permitted thirty (30) days to file such attachments.

3. The following companies frequently named as parties-defendant in asbestos-related suits shall designate a local agent for service of process in the Eastern District of Texas, who shall accept service of process by registered mail as substitute service.

a. Armstrong Cork Company

b. Atlas Asbestos

c. Celotex Corporation/Phillip Carey Manufacturing Company

d. Combustion Engineering

e. Crown Cork and Seal (Mundet)

f. Eagle-Picher Industries, Inc.

g. Empire Asbestos

h. Fibreboard Corporation

i. Forty-eight Insulations

j. GAF Corporation (Ruberoid Corporation)

k. Garlock

l. Johns-Manville Sales Corporation

m. Keene Corporation

n. Nicolet Industries, Inc.

o. Owens-Corning Fibreglas

p. Owens-Illinois

q. Pittsburg-Corning

r. H. K. Porter Company, Inc. (Southern Asbestos)

s. Raybestos-Manhatten

t. Rock Wool Manufacturing Company

u. Standard Asbestos Insulating and Manufacturing Company

v. (Turner & Newall, Ltd.)

w. UNARCO

4. All notices required under the Federal Rules of Civil Procedure to be sent by certified mail that pertain to discovery matters or medical examinations may be sent by regular mail.

5. The defendants in each case shall designate one liaison counsel to coordinate discovery and the filing of motions and responses to motions. It shall be the responsibility of the liaison counsel to avoid duplication in any of these pretrial matters, and to ensure that no party is unnecessarily inconvenienced by the scheduling of depositions. All other defense counsel shall confer with the liaison counsel before filing any motion or scheduling any deposition.

6. Thirty (30) days after the filing of the defendant's answer, the defendants shall answer completely the plaintiff's master set of interrogatories on file in the District Clerk's office, and shall supplement such answers with any new information as it is received, up to and including time of trial.

7. No additional interrogatories or requests for admission shall be submitted to any party except by order of the Court upon motion demonstrating extraordinary circumstances.

8. Motions to dismiss or transfer for improper venue or for forum nonconveniens and motions to dismiss for lack of diversity shall be filed no later than thirty (30) days after the defendants' answer is filed.

9. No further discovery may occur until all parties have complied with the above discovery requirements, except by order of the Court upon motion showing extraordinary circumstances.

10. Each defendant is deemed to be asserting a cross-action for indemnity or contribution against all other defendants; therefore, cross-claims should not be filed. In the event that any defendant is dismissed from the main action, all cross-actions deemed by this order to have been asserted by or against said defendant will be automatically dismissed; therefore, motions by such defendants for dismissal of cross-claims should not be filed. These provisions do not apply to third-party complaints that allege the breach of a direct responsibility to the third-party plaintiff; such complaints require formal filing and dismissal.

11. No additional parties may be joined after sixty (60) days from the filing of defendants' answer.

12. The following standard motions, in all cases in which they are applicable, will be considered for purposes of appeal to have been timely filed and responded to, and are disposed of as indicated. No such motions or responses need be or shall be filed.

a. The plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT on grounds of collateral estoppel is DENIED.

b. The plaintiff's MOTION FOR LEAVE TO ASSERT CLAIM FOR PUNITIVE DAMAGES is GRANTED.

c. The parties' MOTIONS TO USE DEPOSITIONS TAKEN IN OTHER CASES is GRANTED, subject to specific objections at time of trial to the admissibility of specific parts. The parties shall designate to each other by page and line the parts of the depositions that they intend to use no later than five (5) days prior to trial.

d. All defendants' MOTIONS FOR SUMMARY JUDGMENT on grounds that the plaintiff was not exposed to their products are DENIED. The plaintiff's failure to nonsuit any particular

defendant at least seven (7) days before trial is a representation to the Court that the plaintiff will present competent evidence at trial that he was exposed to the defendant's products. The failure of the plaintiff to present such evidence will subject the plaintiff to such sanctions as the Court in its discretion deems proper, including but not limited to costs and reasonable attorney's fees for the defendant in question.

In the event that the case is appealed, all of the above motions that any party desires to preserve for appeal must actually be filed in the clerk's office no later than twenty-five (25) days after the notice of appeal is filed.

13. When the interests of more than one party plaintiff or defendant are the same in regard to a particular motion, the motion shall be filed jointly by all parties having such common interests. Such parties shall designate a lead attorney to act as spokesman for the motion. This designation shall be coordinated through the liaison counsel for the respective parties. No party shall waive any rights by failing to attend a hearing on such motion, unless the attendance of the party has been ordered by the Court. The designation of any attorney to act as spokesman for a group of plaintiffs or defendants shall not preclude counsel for any party from participating to the extent necessary to represent the individual interests of his client, as long as said participation does not involve duplication.

14. To the extent practicable, all motions that apply to more than one case, for example a motion to quash a general deposition, shall be filed as a single motion listing all cases to which it applies in separate headings.

15. Attorneys handling asbestos cases in the Eastern District of Texas shall consult with each other concerning persons whom they desire to depose, and to the extent practicable they shall coordinate scheduling of depositions desired for more than one case so as to minimize inconvenience and expense to the deponents or any party of record as of the date of filing notice of the deposition.

16. Notices of depositions shall be served at least two (2) weeks prior to the date they are taken, except by agreement of all counsel, or by order of the Court upon motion showing extraordinary circumstances.

17. The Court hereby approves the proper utilization of multi-state depositions by all parties in order to prevent unnecessary expense and delay. General objections to the taking of multi-state depositions will be considered to have been timely and are hereby overruled. In the event of the taking of any expert witness's multi-state or out-of-state deposition, at least twenty-one (21) days' notice must be given.

18. No depositions, interrogatories, requests for admissions, or answers thereto shall be filed in the Clerk's office except by order of the Court, except for answers to the master sets of interrogatories. A party filing an objection to interrogatories or requests for admission shall attach a copy of said interrogatories or requests to its objection.

19. The Clerk's office will not mail copies of motions to counsel of record; counsel for the party filing the motion is responsible for sending a true and correct copy of the motion to all counsel of record, and must certify in an affidavit attached to the motion that such copies *have been mailed.* If the Court, in ruling on the motion, utilizes the proposed order provided by the party prevailing on the motion, the Clerk's office will not mail copies of the order to attorneys of record, but simply a notice of whether the motion was granted or denied. Only if the Court elects to rule on the motion with an order of its own design, or if elaboration is necessary, will the Clerk's office mail copies of the order.

20. At any time after ninety (90) days from the date the defendants comply with the requirements of provision (6), but no later than one hundred twenty (120) days from that date, the defendants may have, upon request and at their own expense, an independent medical examination conducted of each plaintiff for each field of medicine

applicable to that plaintiff's allegations, by a specialist in that field. No surgical procedures for the removal of tissue or other purposes other than routine blood testing shall be permitted except by order of the Court upon motion showing extraordinary circumstances. Expenses shall include the cost of the examinations, reimbursement of the plaintiff's wages for the plaintiff's actual time lost from work to attend the examinations, and, if the examinations are conducted in a location other than the areas in which the plaintiff resides or works, any actual cost of travel, lodging, or food. The plaintiff's counsel shall be furnished with copies of all reports resulting from the examinations or from evaluations conducted for defendants of medical evidence voluntarily produced by the plaintiff, including but not limited to those of x-rays, tissue samples, blood samples, etc. The provisions of Rule 35, Federal Rules of Civil Procedure, shall apply with respect to the waiver of the patient-physician privilege. The utilization of the procedure outlined above shall not preclude any defendant from proceeding in strict accordance with the provisions of Rule 35, Federal Rules of Civil Procedure, either in lieu of the above procedure or subsequent to the utilization thereof.

21. Six (6) to nine (9) months after suit is filed, a status conference will be held by the Court or by the Magistrate. Within thirty (30) days thereafter, the parties shall exchange all exhibits to be used at trial and a list of all witnesses to be called. Thirty (30) days after this exchange, the parties shall exchange any additional exhibits and witness lists. The parties shall be allowed thirty (30) additional days from the supplemental exchange of exhibits and witness lists for any additional discovery directly related to those exhibits and lists, if not previously discovered. No additional discovery shall be permitted except by order of the Court upon motion showing extraordinary circumstances. No witnesses or exhibits that were not furnished to the opposing side in accordance with the above deadlines shall be used at trial except for impeachment purposes, except by order of the Court upon motion showing extraordinary circumstances.

22. The plaintiff's and defendants' standard MOTIONS IN LIMINE on file in the Clerk's office shall be considered in all asbestos-related cases at the time of trial. No additional matters in limine shall be filed prior to the time of the trial.

23. In the event that some of the defendants have come to agreement with the plaintiff on the terms of individual settlements before jury selection begins in the case, the Court may, on its own motion or on motion of any party, approve the individual settlements and bring the case to trial between the plaintiff and non-settling defendants. If more than one asbestos-related case is set for jury selection on the same day, and if the non-settling defendants in the cases are the same, the Court will consider consolidating any or all of those cases for jury selection and trial.

24. If a case is removed from the docket because it is announced settled, and if any of the settling defendants have not paid their portion of the settlement within thirty (30) days of the announced settlement, then the non-paying defendants shall be liable for interest on the entire amount of settlement at the legal rate of nine percent (9%) per annum, from the date settlement was announced.

25. Checks in payment of settlement or judgment shall be sent directly from each individual defendant's attorney to the plaintiff's attorney.

26. Failure to comply with this order shall subject a party and/or its attorney to appropriate sanctions, including, but not limited to, costs and reasonable attorney's fees, the dismissal with prejudice of plaintiff's claims, or the striking of defendant's defenses.