761 F.2d 1129
 18 Fed. R. Evid. Serv. 296, Prod.Liab.Rep.(CCH)P 10,820
Howard Eugene GIDEON, et al., Plaintiffs-Appellees,
v.
JOHNS-MANVILLE SALES CORPORATION, et al., Defendants,
Raymark Industries, Inc., Keene Corporation, Standard
Insulations, Inc., et al., Defendants-Appellants.
 No. 83-2626.
 United States Court of Appeals,
Fifth Circuit.
 June 3, 1985.
 
 Butler & Binion, Elizabeth M. Thompson, Houston, Tex., for Raymark industries.
 Mehaffy, Weber, Keith & Gonsoulin, O.J. Weber, Sandra F. Clark, Beaumont, Tex., for Keene Corp. & Standard Insulations, Inc.
 Weller, Wheelus & Green, George A. Weller, David L. Tolin, Beaumont, Tex., for Fibreboard Corp.
 Bean & Manning, Andrew McKinney, Frank Bean, Houston, Tex., for Eagle-Picher Industries, Inc.
 Benckenstein, Norvell & Bernsen, Lipscomb Norvell, Jr., Beaumont, Tex., for Celotex Corp.
 Baker & Botts, F. Walter Conrad, Susan Roehm, Houston, Tex., for Gaf Corp.
 Wellborn, Houston, Perry & Adkinson, Rex Houston, Paul L. Sadler, Henderson, Tex., for plaintiffs-appellees.
 Appeals from the United States District Court for the Southern District of Texas.
 Before CLARK, Chief Judge, GOLDBERG and RUBIN, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 This suit for personal injuries allegedly caused by the inhalation of asbestos fibers is one of 25,000[1] pending in federal and state courts. After a ten-day trial, the jury returned a verdict against seven of the seventeen defendants originally named and fixed the compensatory damages at $500,100. The judge reduced the amount of the judgment to reflect the effect of the settlement that the plaintiffs had reached with three of the original defendants.
 
 
 2
 The judgment entered on that verdict is based in part on one jury's resolution of issues that are common to all or most of the cases in this mass litigation. These issues include whether the asbestos products of various manufacturers were unreasonably dangerous, whether the manufacturers knew or should have known them to be dangerous when sold, and whether an asbestosis plaintiff may adduce evidence of an alleged increased risk of contracting cancer in the future. It is also based on the resolution of issues specific to this plaintiff and these defendants, which include the nature and extent of the plaintiff's exposure to the products of each defendant, whether the plaintiff failed to mitigate his damages, and whether the district court erred in prohibiting the named defendants from producing evidence of the plaintiff's exposure to products of two manufacturers who have filed for bankruptcy. The appeal also raises issues concerning evidentiary rulings at trial and the district court's jury instructions.
 
 
 3
 We discuss each issue in turn and conclude that the evidentiary rulings were correct, the instructions adequate, and the evidence sufficient to support the judgment against five of the seven defendants. We, therefore, affirm the judgment as to five defendants. We reverse the judgment as to two defendants because the evidence adduced in this case was insufficient to establish that their products were a producing or aggravating cause of Gideon's injuries. We remand and direct the district judge to redetermine the sum to be awarded the plaintiffs now that the total number of defendants cast in judgment together with those who had effected compromises is changed.
 
 RESUME OF THE RECORD
 
 4
 Howard E. Gideon, who was fifty-nine years old at the time of trial, worked for Standard Insulations, Inc. (Standard) as an insulation warehouseman from 1944, when he was 20 years old, until 1969. During this period he handled asbestos products daily as a major part of his work. In 1969, he began working for P & R Insulations as an estimator and he has since continued to do that work. Working principally in an office, Gideon estimates the costs of doing a proposed insulation job, prepares a bid for the work, and, if his employer is awarded the work, orders the material and follows the work on the job to ensure that the costs do not exceed the budget.
 
 
 5
 Gideon claims that he suffers from asbestosis and is likely to develop mesothelioma or some other form of cancer as a result of his inhalation of asbestos fibers. He sued seventeen manufacturers of asbestos products, contending that he worked with products made by each and that each contributed to his present condition. Before trial, Gideon settled his claims against three defendants and dismissed his claim against one without prejudice. The court severed the claims against two defendants, Johns-Manville Sales Corporation and Unarco Industries, Inc., for later trial because these defendants had filed petitions for reorganization under Chapter 11 of the Bankruptcy Act and the bankruptcy court had stayed proceedings against them.
 
 
 6
 The jury returned a verdict against seven defendants for $500,000, rejected Gideon's claims against four defendants, awarded him exemplary damages of $1,000 against Raymark Industries, Inc. (Raymark), and awarded his wife $100 for loss of consortium. The district court ordered a pro rata reduction of $150,030 in the compensatory damages to account for the prior settlement with three defendants, thus reducing the verdict to $350,070.
 
 This appeal raises the following issues:
 
 7
 (1) whether the district court erred in admitting the expert testimony of a medical doctor because he was neither an expert nor impartial and in admitting the testimony of a biostatistician-epidemiologist because he was not a medical doctor; discussed at I, below;
 
 
 8
 (2) whether, because Gideon does not now suffer from any form of cancer, the district court should have excluded evidence of the risk of his developing cancer in the future, and whether the district court erred in refusing to instruct the jury that Gideon could not recover for his fear of contracting or dying from cancer; discussed at II, below;
 
 
 9
 (3) whether the court properly instructed the jury on the issues raised by evidence of Gideon's continued smoking and his failure to exercise after he was advised by doctors to stop smoking and to engage in a regular exercise program; discussed at III, below;
 
 
 10
 (4) whether the district court should have allowed the defendants to introduce evidence of Gideon's exposure to products of the two defendants who are in reorganization proceedings, Johns-Manville and Unarco; discussed at IV, below;
 
 
 11
 (5) whether the court properly instructed the jury on whether the defendants' asbestos products were defectively designed; discussed at V below;
 
 
 12
 (6) whether there was insufficient evidence that the defendants' products were unreasonably dangerous; discussed at VI, below;
 
 
 13
 (7) whether there was insufficient evidence to support the verdict against two defendants, Raymark and Standard, discussed at VII, below.
 
 
 14
 The history of litigation concerning asbestos-related diseases, the nature and cause of asbestosis, mesothelioma, and other lung diseases that may be caused by inhalation of asbestos fibers, and the legal principles governing products-liability litigation have been discussed by us many times in the more than 25 cases in which we have considered such matters.[2] We, therefore, do not review these matters further.
 
 I.
 
 15
 The district court's admission of testimony by two expert witnesses is challenged. The defendants contend that the medical doctor who testified in support of Gideon's claims was but an advocate, not an expert, and that a biostatistician-epidemiologist was improperly permitted to give a medical opinion.
 
 
 16
 Federal Rule of Evidence 702 permits the trial court to admit the testimony of "a witness qualified as an expert by knowledge, skill, experience, training, or education" if his expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Whether a witness is qualified to testify as an expert is left to the sound discretion of the trial judge, who is in the best position to determine both the claimed expertise of the witness and the helpfulness of his testimony.[3]
 
 
 17
 Gideon's principal medical witness, Dr. Comstock, is assailed as being an advocate for his patient rather than a practitioner of the healing arts, and his testimony is deprecated because his specialty "in the limited field of toxicology" was not recognized by the American Medical Association. He is sought to be impeached because he has allegedly seen 673 asbestos exposure patients since 1978 almost all of whom have been referred to him by plaintiff's attorneys. Dr. Comstock's credentials, however, passed the threshold of admissibility. He is a doctor of medicine with an earlier M.A. degree in bacteriology and biochemistry; he received his M.D. twenty-seven years ago, has been a research assistant in bacteriology and virology, and an assistant research toxicologist, and he has in addition done other medical work. Since 1970 he has been an adjunct associate professor of toxicology at the University of Texas School of Public Health and has devoted considerable time to the study of the toxic effects of industrially-used substances, especially asbestos. Dr. Comstock's expertise and impartiality were vigorously attacked, but the degree to which his testimony was thus impugned was for the jury to evaluate.
 
 
 18
 The district court also acted within the bounds of discretion in admitting the testimony of Dr. Joseph K. Wagoner. Wagoner is not a doctor of medicine, but of philosophy. He is a biostatistician and epidemiologist specializing in the study of the causes of disease and its effects upon individuals and the public.
 
 
 19
 The objection to his testimony is based on the assumption that he gave medical testimony. Dr. Wagoner, however, did not testify about Gideon's physical condition or prognosis. He testified only on matters of epidemiology: the risk of cancer and reduced life expectancy associated with asbestosis. As an epidemiologist, he was also competent to testify that the toxic effects of inhaling asbestos were known prior to the 1940s. These matters were within his professional competence and met the test of Rule 702.
 
 II.
 A.
 
 20
 The defendants next contend that, because Gideon concededly did not have cancer, it was error to admit testimony concerning the enhanced risk that he would develop cancer in the future. This evidence, the defendants argue, "did not rise to the level of reasonable medical probability." The argument commingles several concepts and is predicated at least in part on the thesis that each of the injurious results of a harmful act is a separate tort. This being a diversity case, we find our authority in Texas law, although that state's law appears to accord with principles generally applicable at common law. We express no opinion concerning what the result would be were the case governed by Mississippi law, questions about which we have certified to the Mississippi Supreme Court.[4]
 
 
 21
 An actionable tort, whether based on negligence or strict liability, consists of two elements: a failure to act in accordance with the standard of care required by law and a resultant injury. While the sale of a defective product creates a potential for liability, the law grants no cause of action for inchoate wrongs. However egregious the legal fault, there is no cause of action for negligence or products liability until there is "actual loss or damage resulting to the interests of another."[5]
 
 
 22
 While, therefore, "the threat of future harm, not yet realized, is not enough,"[6] once injury results there is but a single tort and not a series of separate torts, one for each resultant harm. The cause of action thus created is for all the damage caused by the single legal wrong, and a plaintiff may not split this cause of action by seeking damages for some of his injuries in one suit and for later-developing injuries in another.[7] The cause of action "inheres in the causative aspects of a breach of a legal duty, the wrongful act itself, and not in the various forms of harm which result therefrom...."[8] He does not have a discrete cause of action for each harm.
 
 
 23
 Gideon claims that, "as a result of working with each of the defendants' asbestos products," he "has been seriously and permanently injured as the result of contracting asbestosis, lung cancer, pulmonary disease, possibly mesothelioma, and other related diseases now developed, in the developing stages or which will subsequently develop as a result of his contact with the asbestos products manufactured, sold and distributed by the various defendants."
 
 
 24
 Gideon's theory of recovery, supported by testimony in the record, is that he inhaled asbestos fibers while working with defective asbestos products. This initiated a scarring process that destroyed some of the air sacs in his lungs. Other changes occurred as the fibers worked through his lung tissues and lodged in the membrane surrounding his lungs, causing pleural thickening, plaques, calcifications, and asbestosis as well as the likely future development of mesothelioma and cancer. His injury is thus the inhalation of fibers and the invasion of his body by those fibers, thus causing him physical damage.[9]
 
 
 25
 Under Texas law, therefore, Gideon has but one cause of action for all the damages caused by the defendants' legal wrong; the diseases that have developed and will in probability develop are included within this cause of action, for they are but part of the sequence of harms resulting from the alleged breach of legal duty.[10] Gideon could not split his cause of action and recover damages for asbestosis, then later sue for damages caused by such other pulmonary disease as might develop, then still later sue for cancer should cancer appear. His claim includes, without limitation, all damages for future pain and suffering, inability to work in the future, reduced life expectancy, future medical expenses, and future disabilities and diseases that will probably develop from present injuries.[11]
 
 B.
 
 26
 Whether the district court should have excluded evidence that Gideon may develop cancer turns on epistemology. While a plaintiff who seeks to recover for damages he is likely to sustain in the future must prove these future damages by a preponderance of the evidence, he can do so only by adducing expert opinion, for what the future holds can only be prophesied. In Texas,[12] as elsewhere,[13] the time-honored method of proving future physical condition is to present a qualified physician's opinion testimony based on reasonable medical probability. Possibility alone cannot serve as the basis for recovery, for mere possibility does not meet the preponderance of the evidence standard.[14] Certainty, however, is not required: the plaintiff need demonstrate only that the event is more likely to occur than not.
 
 
 27
 Gideon presented expert testimony that there was a reasonable medical probability both of his developing and of his dying from a cancer induced at least in part by his inhalation of asbestos fibers. Dr. Comstock testified, "... in my opinion in reasonable medical probability he will die of an asbestosis-related cancer. That is it's greater than 50 percent risk." He continued, "I said in reasonable medical probability he will die of an asbestos-related malignancy. He will die with asbestos disease. There is no doubt about it." Dr. Comstock was vigorously cross-examined. The defendants' experts gave different opinions. The verdict was for the jury.
 
 
 28
 Gideon did not seek to recover only for the risk of future harm. He now suffers from a diagnosed disease, asbestosis, as well as from other injury to his lungs. The testimony that he had a "greater than 50 percent risk" of dying from an asbestos-related malignancy was probative both of the extent of his injury and of the amount of his damages. The evidence should not, therefore, have been excluded on the basis that its probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."[15] That the evidence was prejudicial to the defendants is patent. But it was crucial and the prejudice cannot be said to have been unfair.
 
 
 29
 Given the testimony that Gideon was likely to develop and die from cancer, the district court did not err in refusing to charge the jury that Gideon could not recover for his fear of future injury and death. Texas law permits the recovery of damages for mental anguish at least when there is actual physical injury.[16] It does not appear that recovery for anxiety must be limited to concern about the injury that is already manifest. Gideon may, therefore, recover for the fear of future conditions that will, in medical probability, develop from presently existing injuries.[17] We need not consider whether Texas law precludes recovery for the fear of developing a disease when it is not likely to result[18] or when no injury has yet been diagnosed.[19]
 
 III.
 
 30
 The defendants assert that the jury must have been confused by the evidence relating to Gideon's smoking habit. Gideon testified that he had smoked in previous years but had stopped until 1978, that he had smoked one pack of cigarettes a day since 1978, and that he may have told one of the doctors who examined him that he had smoked for twenty years. Dr. Comstock and Gideon both testified that Dr. Comstock had advised Gideon to stop smoking and to engage in regular exercise. Gideon testified that he had done neither. The experts for both sides testified that the risk that a person who has inhaled asbestos fibers will develop cancer is vastly increased if the person smokes.
 
 
 31
 While much of this evidence was indeed adduced initially by Gideon, his lead was patently a trial strategy to counter the issues raised by the defendants in the pretrial order: "Was plaintiff's cigarette smoking the sole cause of his physical condition?" and "[s]hould plaintiff's damages, if any, be reduced by the amount which smoking or other toxic exposures, if any, contributed to his condition?" The evidence of Gideon's smoking was exploited by defendants in cross examination and formed the foundation for their contentions that Gideon had failed to mitigate his damages and that smoking was the true threat to his health. Those issues having been presented, Gideon's counsel cannot be faulted for raising Gideon's smoking in an attempt to disarm the defendants' impending attack.
 
 
 32
 The testimony about smoking was admissible, for it related directly to the extent of damage caused by the inhalation of asbestos fibers. It was not likely to have confused the jury in determining whether Gideon's increased risk of cancer resulted proximately from smoking, from exposure to asbestos, or from both causes. It was for the jury to make this determination. The jury was capable of sifting through and weighing the evidence as to each potential cause.
 
 
 33
 The defendants assert that the jury instructions concerning Gideon's duty to follow his doctor's advice and to avoid aggravation of any injury were erroneous. While it is commonly said that an injured party has a "duty" to minimize damages, this is a misnomer, for the victim owes no duty to the person who hurts him.[20] The principle, correctly stated, is that the injured person may not recover damages that do not result proximately from the defendant's breach of duty.[21] Damages that might be avoided or mitigated are, therefore, not recoverable. Texas courts follow this principle: failure to secure medical treatment bars recovery of those damages that would have been averted had proper treatment been obtained or had medical advice been followed.[22]
 
 
 34
 The district court adequately instructed the jury that "any person who claims damages ... has a duty under the law to mitigate those damages--that is, to take advantage of any reasonable opportunity he may have had under the circumstances to reduce or minimize the loss or damage." The court added, "[t]he plaintiff has a duty to minimize his damages by following the expert recommendations of his physicians" and elaborated on this instruction.[23]
 
 
 35
 Instead of commenting on these instructions, the defendants focus on another part of the charge relating to aggravation of an existing disease. This charge appears three pages earlier in the transcript and therefore must have been given at least three or four minutes earlier. The defendants argue that the aggravation charge confused the jury because there is no evidence in the record that inhaling asbestos fibers aggravated some other disease from which Gideon was already suffering. That charge, the full text of which is set forth in the footnote,[24] was at worst innocuous if there was no evidence of aggravation of an existing disease. It neither contradicted nor obviated the effect of the mitigation-of-damages instruction.
 
 
 36
 Jury instructions are not reviewed on appeal for letter-perfect accuracy. The district court's task, difficult at best, is to inform the jurors of their duty and to explain the rules of law to apply in reaching a verdict. The task is adequately performed if the instructions state the applicable rules with reasonable accuracy and clarity, without misleading misstatement. Perfection is to be sought, but failure to achieve it is not ground for reversal so long as the instructions, viewed as a whole and without dissecting every sentence, enable the jury to understand the issues and the law.[25]
 
 IV.
 
 37
 Johns-Manville and Unarco each filed petitions for reorganization in bankruptcy after the plaintiffs filed their claims. Automatic stays of proceedings went into effect upon the filing of those petitions. Neither plaintiffs nor defendants sought relief from the resultant automatic stays for this proceeding.
 
 
 38
 By motion in limine, Gideon requested that the defendants be precluded from referring to or presenting evidence regarding Johns-Manville or Unarco or Gideon's exposure to the products of those defendants. The district court granted this request over the objections of the defendants. During trial the defendants made an offer of proof describing the evidence they would present if allowed to do so. The court denied this offer.
 
 
 39
 The defendants did not, as they now urge, offer evidence that the products of Johns-Manville and Unarco were the sole causes of Gideon's injury or that, as asserted in their brief, "the plaintiff's alleged injuries were in fact caused by a third party." Their offer was intended "to show that Johns-Manville and Unarco products contributed to cause whatever condition Mr. Gideon has."[26] The purpose of the offer was repeated several times.
 
 
 40
 The defendants now pose the issue to us in a form different from their argument and proffer to the district court. They assert, "[t]he court's prohibition of evidence regarding exposure to Johns-Manville's products prevented the defendants from introducing evidence that their products are similar and virtually indistinguishable from those of Johns-Manville and that the products allegedly used by the plaintiff were manufactured by a company other than these defendants." No proffer of evidence for this purpose was made in the district court.
 
 
 41
 "Error may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected and ... the substance of the evidence was made known to the court by offer."[27] The defendants are thus bound by the substance of their proffer, which was to prove that Johns-Manville and Unarco products contributed to Gideon's injuries. We review the district court's ruling only for its correctness in rejecting the proffer actually made.
 
 
 42
 Texas law allows each joint tortfeasor to secure contribution from the other joint tortfeasors, deducting the share of those who have settled with the plaintiff.[28] The Texas statutes state that the contribution shall be determined by the number of solvent defendants. While it has not yet been decided that Johns-Manville and Unarco are in fact insolvent, they have each filed proceedings in bankruptcy asserting insolvency. If they are later found not to be insolvent, the contribution claims asserted against these companies can then be decided.[29] The court's ruling, therefore, did not preclude the defendants' obtaining contribution from Johns-Manville and Unarco. It simply postponed those claims for later decision either by the bankruptcy court or in future litigation.
 
 
 43
 Because of the stays in bankruptcy, the rights of the defendants to contribution from Johns-Manville and Unarco could not be determined by the jury. At the time of this trial the jury was not responsible for apportioning fault among the tortfeasors. The issue was whether each of the defendants was responsible for Gideon's injury. Those defendants found responsible were liable jointly and severally for all of Gideon's damages because they contributed to a single, indivisible injury to the plaintiff.[30] The potential insolvency of Johns-Manville or Unarco must be borne by the solvent co-tortfeasors and not by the plaintiffs.[31] Evidence of Gideon's exposure to the products of Johns-Manville and Unarco was thus not material to this litigation, so long as the jury found that the products of each defendant cast in judgment were producing causes of Gideon's condition.[32] The rights between the solvent and insolvent defendants can be determined in a subsequent proceeding. Any attempt by the solvent defendants to produce evidence of Gideon's exposure to the products of Johns-Manville or Unarco could have only encouraged the jury to shift the burden of their potential insolvency to the plaintiffs. The district court did not err in preventing this result.
 
 
 44
 The defendants urge that Gideon "opened the door" to evidence about Johns-Manville and Unarco by his incidental comment that he handled the product Unibestos and by his introduction of the "Sumner Simpson" papers,[33] which had been found in the files of the former president of Raybestos-Manhattan. Two of these papers contain an interchange between Simpson and Johns-Manville's attorney concerning the dangers of asbestos fibers. These passing references were not likely to have confused or misled the jury. Gideon's testimony that he handled the product "Unibestos," manufactured by Unarco until 1962 and then by Pittsburg Corning, was prejudicial neither to Pittsburg Corning nor to any other defendant and had no tendency to confuse the jury. We have held the "Sumner-Simpson" papers admissible to show what asbestos manufacturers other than Johns-Manville knew or should have known about the dangers of inhaling asbestos fibers.[34] They were offered in this case only for the same purpose, to establish the knowledge of the defendants. Their admission did not open the door to evidence of Gideon's exposure to the products of Johns-Manville or Unarco.
 
 V.
 
 45
 Gideon contended that at the time each defendant's products left its possession a defect existed that made the products unreasonably dangerous. The district court charged the jury that, "[f]or a product to be unreasonably dangerous, it must be more dangerous than would be contemplated by the ordinary purchaser or user with the ordinary knowledge common to the community as to its characteristics or uses.... [T]he product must create an unreasonable risk of harm to the ordinary user, if the product is used in a manner which can reasonably be foreseen and anticipated by the manufacturer or seller of the product."[35] The court added, "[i]n determining whether the dangers posed by a product are unreasonable, you should consider both the utility of the product and the risks involved in its use. In effect, you are required to balance the utility of the product against the likelihood of and gravity of injury from its use."
 
 
 46
 The Texas Supreme Court has expressly held, in Turner v. General Motors Corporation,[36] that, although evidence of the expectations of the ordinary consumer and the care of a prudent manufacturer may be introduced at trial, "henceforth in the trial of strict liability cases involving design defects the issue and accompanying [jury] instruction will not include either the element of the ordinary consumer or of the prudent manufacturer."[37] The court set forth the instruction to be used: "By the term 'defectively designed' as used in this issue is meant a product that is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use."[38]
 
 
 47
 The charge given by the district court obviously did not conform to the Turner requirements because it instructed the jury to consider the safety expectations of the ordinary user.
 
 
 48
 The defendants, however, did not preserve this objection to the jury instructions. They objected only to the "risk-utility" portion of the instruction and their proffered instruction sought only a modification of this "risk-utility" language. This part of the instruction conformed to the requirements of Turner. The defendants did not object to the "ordinary purchaser" language that was also included in the instruction. Federal Rule of Civil Procedure 51 provides that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Absent plain error, which we do not find here, viewing the instruction as a whole, we do not review objections to jury instructions raised for the first time on appeal.[39]
 
 VI
 
 49
 The defendants next contend that the evidence was insufficient to establish that their products were unreasonably dangerous and producing causes of Gideon's injuries. Asbestosis and asbestos-induced cancer are, according to the trial testimony, dose-related diseases; their incidence is directly related to the quantity of asbestos inhaled. The record indicates that only inhalation of large amounts of asbestos fibers over a significant period of time will cause asbestosis. The damage is, however, cumulative. Because inhaled fibers are not all exhaled, but some remain in the lungs and cause reactions there, the later inhalation of added amounts will cause injury that might not have occurred had exposure ceased. There was less testimony about the etiology of mesothelioma and other cancers and, whatever the medical facts or the testimony in other cases may be, the record in this case contains no suggestion that these conditions can be contracted from inhalation of only minimal amounts of asbestos fibers.
 
 
 50
 In Borel v. Fibreboard Paper Products Corporation,[40] we set forth the Texas standards for establishing the strict liability of a manufacturer. The plaintiff must prove that the product was unreasonably dangerous when sold. He must establish that the utility of the product in question did not outweigh the magnitude of its danger. "Liability may not be imposed merely because a product involves some risk of harm or is not entirely safe for all uses. Products liability does not mean that a seller is an insurer for all harm resulting from the use of his product."[41] The Texas Supreme Court has ruled that "[t]he prime requirement for imposing liability on a seller under the rule of strict liability is proof by the plaintiff that he was injured because of a defective condition in the product when it left the hands of the particular seller."[42]
 
 
 51
 If, as in this case, the plaintiff also asserts that the products were unreasonably dangerous because the defendants failed to warn of their hazards, he must show that the defendants either knew or should have known of these dangers when the products were sold.[43] In determining what the manufacturer knew or should have known, the trier of fact may hold the manufacturer "to the knowledge and skill of an expert."[44]
 
 
 52
 We have refused to hold asbestos products inherently dangerous.[45] At this time, whether an asbestos product is or is not unreasonably dangerous must be decided on the basis of the evidence as to the specific qualities of the particular product.
 
 
 53
 The evidence in this case was not materially different from that presented in Borel. It was contradictory. Gideon's expert witness testified that all inhaled asbestos fibers remain in the lungs, but the defendants' experts testified that, if a person inhales such fibers in small amounts, he will exhale them. There was evidence that the danger to users who inhaled asbestos fibers became known to experts before Gideon began handling the products in 1944. There was evidence to the contrary, including testimony that the initial studies of asbestos-related health hazards focused on mine workers, who received much greater exposure than those, like Gideon, who merely handled insulation products. There was evidence that the danger to insulation workers became known only much later and that the defendants acted promptly to give warnings once they knew of the dangers.
 
 
 54
 In weighing the evidence, we must apply the federal standard for determining its sufficiency[46] as defined in Boeing Company v. Shipman.[47] We find in the record "substantial evidence ... of such quality and weight that reasonable and fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions."[48] Accordingly, we conclude that the issue was for the jury and that the evidence was sufficient to sustain its verdict as to all defendants except Raymark and Standard.
 
 VII.
 
 55
 Raymark and Standard assert that, whatever the evidence as to the other defendants, the evidence was insufficient to establish their liability because of the different nature of their products and, in the case of Standard, because Gideon was exposed to its products for only a short period of time during which it could be held liable in tort. To evaluate these arguments we must consider the nature of these defendants' products and the extent of Gideon's exposure to them.
 
 
 56
 Gideon testified that, when he handled various asbestos products, dust was created. However, there was no testimony, lay or expert, concerning the relative amounts of dust created when he handled each of the many products.
 
 
 57
 Raymark and its predecessor, Raybestos Manhattan, manufactured only asbestos textile products and asbestos gaskets and packing materials. Neither has ever made or sold insulation products or asbestos cement.
 
 
 58
 Raymark's textiles are manufactured in a conventional manner: asbestos fibers are combined with cotton and rayon and entered into a carding machine which rolls and combs the fibers. The fibers form a web which is then rubbed by a machine to form asbestos roving. The roving is twisted on a spinning machine to form asbestos yarn. The spinning process locks in the fibers so that either no fibers or minimum quantities of fibers are released during use or handling of the product. The yarns are then woven into the end products. This weaving process futher locks in the fibers. Gasket materials are a blend of asbestos fibers mixed with certain kinds of rubber which are compressed into asbestos sheets. Since the asbestos is encapsulated in the rubber, no measurable amounts of dust are created during use or handling of these materials.
 
 
 59
 The asbestos packings manufactured by Raymark are prelubricated with grease and graphite before being braided into their final form. This lubrication process locks in the asbestos fibers contained in the product.
 
 
 60
 Gideon testified that he worked around Raymark products from 1944 until 1969. He said that Raymark asbestos products were different from those made by the other defendants. The record does not indicate that Gideon had more than slight contact with the Raymark products he handled. He did not testify that he ever used a Raymark product, but that "for the most part" he carried, loaded and sometimes relabeled Raymark products. He did not testify that any dust was created when he handled Raymark products. Of all the Raymark products that Gideon claims he was exposed to, he actually cut only one product, 10,000 pound tensile strength sheet. He did not testify that any dust was created when he cut the sheet into gasket material.
 
 
 61
 Milton Scowcroft, an expert in asbestos textiles and longtime Raymark employee, testified that the mere act of taking Raymark products from the original carton, placing them in another carton and relabeling them, as Gideon testified he had done, would not create any dust. Additionally, he testified that no dust would be created inside the original containers during shipping of the textile products. This testimony was not contradicted.
 
 
 62
 In 1975 and 1976 Raymark tested the fiber release potential of its asbestos cloth and its compressed asbestos sheet during use of those products. The asbestos cloth tested had a higher asbestos content than the cloth typically used in the insulation industry. The tests demonstrated that use of the Raymark products emitted only .05 to .4 asbestos fibers per cubic centimeter, based on a time-weighted average. The Occupational Safety and Health Administration (OSHA) standards required, at the time the tests were conducted, that the ambient air contain no more than two asbestos fibers per cubic centimeter. We take judicial notice that, in November, 1983, OSHA promulgated an emergency temporary standard of .5 fibers per cubic centimeter for exposure to asbestos fibers.[49] Five million particles per cubic foot was, according to the evidence, believed to be safe until the mid-1960's. Compliance with such government safety standards constitutes strong and substantial evidence that a product is not defective.[50]
 
 
 63
 All of the defendants' experts agreed that the average individual is exposed to some asbestos fibers over the course of a lifetime without any risk of harm. Gideon's experts did not testify on this subject. The overwhelming weight of the evidence in this record is that, so far as anyone now knows, occasional exposure to asbestos fibers in small quantities will not cause asbestosis or cancer.
 
 
 64
 As to Raymark, we are unable to find in the record substantial evidence that the danger created by the use of its products outweighed their utility. Raymark was not required to design the safest possible product or a safer product than the one it designed so long as the design adopted was reasonably safe.[51]
 
 
 65
 To establish Raymark's liability for failure to warn of the dangers of using its products, Gideon must prove that the defendant knew or should have known of such dangers at the time the products were marketed.[52] The manufacturer is not liable for failure to warn of dangers unforeseeable at the time it manufactured the product.[53] Gideon introduced no proof that Raymark knew or should have known that its asbestos-containing products could cause harm. Construed most favorably to Gideon, his evidence demonstrated only that Raymark knew that the inhalation of asbestos fibers in certain concentrations might create a health hazard.
 
 
 66
 We have previously held that all asbestos-containing products cannot be lumped together in determining their dangerousness.[54] Proof that asbestos insulation products are dangerous or defective does not satisfy the burden of proving that products used for other purposes, such as asbestos textiles with encapsulated asbestos fibers, are dangerous.
 
 
 67
 OSHA has declined to impose a warning requirement on products such as those sold by Raymark, which "have been modified by a bonding agent, coating, binder, or other material so that during any reasonably foreseeable use, handling, storage, disposal, processing, or transportation, no airborne concentrations of asbestos fibers in excess of the exposure limits prescribed in paragraph (b) of this section will be released."[55] Plaintiffs have not established that Raymark's products were unreasonably dangerous.
 
 
 68
 The verdict against Raymark is further vulnerable because the record lacks evidence that Gideon's exposure to Raymark's products was a producing cause of his injuries or aggravated the effects of his exposure to the products of the other defendants. "Producing cause means an efficient, exciting, or contributing cause, which in a natural and continuous sequence, in connection with any other cause or causes produced the event complained of."[56] Even given the cumulative-dosage evidence already mentioned, there was no evidence that the inhalation of the relatively small amounts of asbestos fibers possibly released during the handling of Raymark products was a substantial factor in causing Gideon's present condition. We reach this conclusion only on the record before us and do not hold that such proof might not be possible in another case.
 
 
 69
 The exclusive remedy provision of the Texas Workmen's Compensation Statute barred Gideon from claiming tort recovery from Standard for injuries suffered during the course of his employment with Standard.[57] Gideon began work for another employer in 1969. While he testified that he handled some Standard products during his subsequent employment with other companies, he was then employed as an estimator. He also did some insulating work and inspected some jobs, but this work was incidental to his primary work, which was of a clerical nature. Weighing Gideon's testimony most favorably to him, we find in the record insufficient evidence that his exposure to Standard's products after 1969 was a producing cause of his injury.
 
 CONCLUSION
 
 70
 Traditional methods of litigation are ill-designed to handle such a volume of cases, for their sheer number is inundating the courts. The costs of litigation amount to $1.59 for each dollar of damage awarded to plaintiffs[58] and the total cost of litigation and damages will amount to billions of dollars. The case-by-case adjudication process will delay decision for years if not decades, burden both claimants and manufacturers with massive litigation costs, leave claimants uncertain about the possibilities of eventual recovery and manufacturers unable to determine their financial exposure, and clog judicial systems so that parties to other litigation are also denied speedy resolutions of their disputes. The plight of injured workers, the economic peril to affected industries, and the clogged court dockets together call for a legislative solution that would take all of these problems into account. Given no such solution, litigants must await the results of a slow deliberative process that was not designed for such a mass of litigation.
 
 
 71
 For the reasons we have given, we AFFIRM the judgment of liability as to all defendants but Raymark and Standard. We REVERSE the judgment as to Raymark and Standard and enter judgment in their favor. In accordance with Texas law, the district judge had reduced the $500,100 verdict on a pro rata basis. Three defendants having settled with the plaintiffs and seven defendants having been cast, the verdict was reduced by 3/10. Now that judgment is to be entered against five defendants, the amount of reduction must be recalculated. We, therefore, REMAND for the district judge's computation of the sum to be awarded the plaintiffs.
 
 
 
 [1]
 Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314 (5th Cir.1985) (en banc) (appendix to dissenting opinion by Clark, Chief Judge)
 
 
 [2]
 Ducre v. Executive Officers of Halter Marine, Inc., 752 F.2d 976 (5th Cir.1985); Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314 (5th Cir.1985); Albertson v. T.J. Stevenson & Co., Inc., 749 F.2d 223 (5th Cir.1984); Hall v. Hvide Hull No. 3, 746 F.2d 294 (5th Cir.1984); Halphen v. Johns-Manville Sales Corp., 737 F.2d 462 (5th Cir.1984); Hansen v. Johns-Manville Products Corp., 734 F.2d 1036 (5th Cir.1984); Wayne v. Tennessee Valley Authority, 730 F.2d 392 (5th Cir.1984); In re Davis, 730 F.2d 176 (5th Cir.1984); Adams v. Johns-Manville Sales Corp., 727 F.2d 533 (5th Cir.1984); Timberlake v. A.H. Robins Co., Inc., 727 F.2d 1363 (5th Cir.1984); Mann v. A.H. Robins Co., Inc., 741 F.2d 79 (5th Cir.1984); Belton v. Fibreboard Corp., 724 F.2d 500 (5th Cir.1984); Lowe v. Ingalls Shipbuilding, A Div. of Litton Systems, Inc., 723 F.2d 1173 (5th Cir.1984); Pavlides v. Galveston Yacht Basin, Inc., 727 F.2d 330 (5th Cir.1984); Donovan v. Oil, Chemical, and Atomic Workers Intern. Union and Its Local 423, 718 F.2d 1341 (5th Cir.1983); Thompson v. Johns-Manville Sales Corp., 714 F.2d 581 (5th Cir.1983); Hargrave v. Fibreboard Corp., 710 F.2d 1154 (5th Cir.1983); Wedgeworth v. Fibreboard Corp., 706 F.2d 541 (5th Cir.1983); Bouvier v. Krenz, 702 F.2d 89 (5th Cir.1983); Hardy v. Johns-Manville Sales Corp., 681 F.2d 334 (5th Cir.1982); Petes v. Hayes, 664 F.2d 523 (5th Cir.1981); Migues v. Fibreboard Corp., 662 F.2d 1182 (5th Cir.1981); Fusco v. Johns-Manville Products Corp., 643 F.2d 1181 (5th Cir.1981); Porter v. American Optical Corp., 641 F.2d 1128 (5th Cir.1981); Martinez v. Dixie Carriers, Inc., 529 F.2d 457 (5th Cir.1976); Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir.1973), cert. denied 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)
 
 
 [3]
 Salem v. United States Lines Company, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); Perkins v. Volkswagen of America, Inc., 596 F.2d 681 (5th Cir.1979); Vallot v. Central Gulf Lines, Inc., 641 F.2d 347 (5th Cir.1981)
 
 
 [4]
 Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314 (5th Cir.1985) (en banc), and Jackson v. Johns-Manville Sales Corp., 757 F.2d 614 (5th Cir.1985) (Certificate from the United States Court of Appeals for the Fifth Circuit to the Supreme Court of Mississippi, Pursuant to Rule 46, Mississippi Supreme Court Rules)
 
 
 [5]
 Prosser and Keeton on Torts, Sec. 30 at 165 (5th ed. 1984). See also Restatement (Second) of Torts, Sec. 907 comment a. (1979); 12 Harper and James, The Law of Torts Sec. 25.1 (1956)
 
 
 [6]
 Prosser and Keeton on Torts, supra note 5, Sec. 30 at 165
 
 
 [7]
 Missouri-Kansas-Texas R. Co. of Texas v. Pluto, 130 S.W.2d 1048, 1053 (Tex.Civ.App.1939), rev'd on other grounds, 138 Tex. 1, 156 S.W.2d 265 (1941); Press v. Davis, 118 S.W.2d 982, 996 (Tex.Civ.App.1938), modified 135 Tex. 60, 140 S.W.2d 438, 440 (1940); Restatement (Second) of Judgments Sec. 25 comment c (1982); F. James and G. Hazard, Civil Procedure, Sec. 11.13 at 557 (2d ed. 1977)
 
 
 [8]
 Annot., 24 A.L.R. 4th 646, 650 (1983). See Landers v. B.F. Goodrich Co., 369 S.W.2d 33 (Tex.1963); Southern Pacific Transport Co. v. State Farm Mut. Ins. Co., 480 S.W.2d 59 (Tex.Civ.App.1972); Garrett v. Mathews, 343 S.W.2d 289 (Tex.Civ.App.1961)
 
 
 [9]
 See, e.g., Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314, 1327-28 (5th Cir.1985)
 
 
 [10]
 Texaco Country Club v. Wade, 163 S.W.2d 219, 223 (Tex.Civ.App.--Galveston 1942), no writ
 
 
 [11]
 E.g., Houston & T.C. Ry. Co. v. Fox, 106 Tex. 317, 320, 166 S.W. 693, 695 (1914)
 
 
 [12]
 Insurance Company of North America v. Myers, 411 S.W.2d 710 (Tex.1966); Houston & T.C. Ry. Co. v. Fox, 106 Tex. 317, 320, 166 S.W. 693, 695 (1914); Lentz v. City of Dallas, 96 Tex. 258, 267, 72 S.W. 59, 62 (1903); Gibson v. Avery, 463 S.W.2d 277 (Tex.Civ.App.--Fort Worth 1970) no writ. See also the following decisions of federal courts applying Texas law: Whitten v. Liberty Mutual Ins. Co., 257 F.2d 699 (5th Cir.1958); Fort Worth & Denver R. Co. v. Janski, 223 F.2d 704, 707 (5th Cir.1955); Fort Worth & Denver City R. Co. v. Smith, 206 F.2d 667, 670 (5th Cir.1953)
 
 
 [13]
 Restatement (Second) of Torts, Sec. 910, comment b. at 469, and Sec. 912, comment e. at 485 (1979)
 
 
 [14]
 Insurance Company of North America v. Myers, supra n. 12; Parker v. Employers Mutual Liability Ins. Co. of Wisconsin, 440 S.W.2d 43 (Tex.1969)
 
 
 [15]
 Fed.R. of Evid. 403
 
 
 [16]
 Harned v. E-Z Finance Co., 151 Tex. 641, 254 S.W.2d 81 (1953); Gamer v. Winchester, 110 S.W.2d 1190 (Tex.Civ.App.1937), writ dismissed; Kimbell v. Noel, 228 S.W.2d 980 (Tex.Civ.App.1950), ref. n.r.e.; Houston Lighting & Power Co. v. Reed, 365 S.W.2d 26 (Tex.Civ.App.1963), ref. n.r.e
 
 
 [17]
 See Houston Lighting & Power Co. v. Reed, 365 S.W.2d 26, 29 (Tex.Civ.App.1963), ref. n.r.e.; Gamer v. Winchester, 110 S.W.2d 1190, 1193 (Tex.Civ.App.1937), writ dismissed; Kimbell v. Noel, 228 S.W.2d 980, 982-83 (Tex.Civ.App.1950), ref. n.r.e
 
 
 [18]
 E.g., Trinity & S. Ry. Co. v. O'Brien, 18 Tex.Civ.App. 690, 46 S.W. 389, 391 (Tex.Civ.App.1898), no writ
 
 
 [19]
 E.g., Lubbock Mfg. Co. v. Sames, 598 S.W.2d 234, 236 (Tex.1980)
 
 
 [20]
 Tennessee Valley Sand and Gravel Co. v. M/V Delta, 598 F.2d 930, 932 (5th Cir.1979)
 
 
 [21]
 Moulton v. Alamo Ambulance Service, Inc., 414 S.W.2d 444, 449 (Tex.1967); Restatement (Second) of Torts, Sec. 918 (1979)
 
 
 [22]
 Moulton v. Alamo Ambulance Service, Inc., 414 S.W.2d 444 (Tex.1967); Gulf C. & S.F.R. Co. v. Mannewitz, 70 Tex. 73, 8 S.W. 66 (1888); City of Fort Worth v. Satterwhite, 329 S.W.2d 899 (Tex.Civ.App.1959); Texas & N.O. Ry. Co. v. Owens, 299 S.W. 933 (Tex.Civ.App.1927)
 
 
 [23]
 See, e.g., Moulton v. Alamo Ambulance Service, Inc., 414 S.W.2d 444, 450 (Tex.1967)
 
 
 [24]
 You should consider ... any aggravation of an existing disease or physical defect or activation of any such latent condition, resulting from such injury. If you find that there was such an aggravation, you should determine, if you can, what portion of the plaintiff's condition resulted from the aggravation and make allowance in your verdict only for the aggravation. However, if you cannot make that determination or if it cannot be said that the condition would have existed apart from the injury, you should consider and make allowance in your verdict for the entire condition
 
 
 [25]
 Pryor v. Gulf Oil Corp., 704 F.2d 1364, 1373 (5th Cir.1983)
 
 
 [26]
 Emphasis added
 
 
 [27]
 Fed.R.Evid. 103; Wright v. Hartford Acc. & Indem. Co., 580 F.2d 809 (5th Cir.1978)
 
 
 [28]
 Texas Rev.Civ.Stat.Ann. arts. 2212 and 2212a (Vernon 1971); Palestine Contractors, Inc. v. Perkins, 386 S.W.2d 764 (Tex.1964); Payne v. Gould, Inc., 503 F.Supp. 1060 (E.D.Tex.1980); Petco Corporation v. Plummer, 392 S.W.2d 163, 166 (Tex.Civ.App.1965), ref. n.r.e
 
 
 [29]
 Texas Rev.Civ.Stat.Ann. art. 2212a, Sec. 2(g) (Vernon 1971)
 
 
 [30]
 Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1094-96 (5th Cir.1973) (applying Texas Law)
 
 
 [31]
 Texas Rev.Civ.Stat.Ann. art. 2212 (Vernon 1971); Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1095 (5th Cir.1973)
 
 
 [32]
 E.g., Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1094 (5th Cir.1973) (applying Texas law)
 
 
 [33]
 See Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314, 1317 (5th Cir.1985) (en banc)
 
 
 [34]
 Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314, 1318 (5th Cir.1985) (en banc)
 
 
 [35]
 Emphasis added
 
 
 [36]
 584 S.W.2d 844 (Tex.1979)
 
 
 [37]
 Id., 584 S.W.2d at 847
 
 
 [38]
 Id., 584 S.W.2d at 847 n. 1
 
 
 [39]
 Bissett v. Ply-Gem Industries, Inc., 533 F.2d 142, 145-46 (5th Cir.1976)
 
 
 [40]
 493 F.2d 1076, 1080 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)
 
 
 [41]
 Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1087 (5th Cir.1973)
 
 
 [42]
 Pittsburg Coca-Cola Bottling Works v. Ponder, 443 S.W.2d 546, 548 (Tex.1969)
 
 
 [43]
 Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1088 (5th Cir.1973)
 
 
 [44]
 Id., 493 F.2d at 1089
 
 
 [45]
 Hardy v. Johns-Manville Sales Corporation, 681 F.2d 334, 348 (5th Cir.1982)
 
 
 [46]
 Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1092 (5th Cir.1973)
 
 
 [47]
 411 F.2d 365, 374 (5th Cir.1969)
 
 
 [48]
 Id
 
 
 [49]
 Asbestos Information Ass'n/North America v. O.S.H.A., 727 F.2d 415, 417-18 (5th Cir.1984), citing 48 Fed.Reg. 51,086-51, 140 (1983) and 29 C.F.R. Sec. 1910.1001 (1983) (text of current rule)
 
 
 [50]
 Simien v. S.S. Kresge Co., 566 F.2d 551, 557 (5th Cir.1978)
 
 
 [51]
 Weakley v. Fischbach & Moore, Inc., 515 F.2d 1260, 1267 (5th Cir.1975) (applying Texas law)
 
 
 [52]
 Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1088 (5th Cir.1973) (applying Texas law)
 
 
 [53]
 Id
 
 
 [54]
 Hardy v. Johns-Manville Sales Corp., 681 F.2d 334, 344-45 (5th Cir.1982)
 
 
 [55]
 29 C.F.R. Sec. 1910.1001(g)(2)(i) (1983)
 
 
 [56]
 Hartzell Propeller Company v. Alexander, 485 S.W.2d 943, 946 (Tex.Civ.App.--Waco 1972), ref. n.r.e.; see Rourke v. Garza, 530 S.W.2d 794, 801 (Tex.1975)
 
 
 [57]
 Texas Rev.Civ.Stat.Ann. art. 8306 Sec. 3 (Vernon 1983)
 
 
 [58]
 Newman, Jon O., "Rethinking Fairness: Perspectives on the Litigation Process," Thirty-Ninth Cardozo Lecture, N.Y. City Bar Assoc., Cardozo Lectures Vol. 40, No. 1 at 12, 15, citing Rand Institute for Civil Justice. J.S. Kakalik et al., Variation in Asbestos Litigation Compensation and Expenses 89, Table 9.3 (1984)